824 So.2d 1 (1999)
Billy Jack THOMAS
v.
STATE.
CR-96-0876.
Court of Criminal Appeals of Alabama.
December 30, 1999.
Opinion on Return to Remand June 30, 2000.
Opinion on Return to Second Remand October 26, 2001.
Opinion on Denial of Rehearing December 21, 2001.
*8 W. Lloyd Copeland, Mobile; T. Jefferson Deen III, Mobile; and W. Gregory Hughes, Mobile, for appellant.
Bill Pryor, atty. gen.; and Sandra J. Stewart, Michelle Riley Stephens, A. Vernon Barnett IV, and Thomas E. Harrison, asst. attys. gen., for appellee.
PATTERSON, Retired Appellate Judge.
The appellant, Billy Jack Thomas, appeals from his convictions for the capital offenses of murder of B.W.L. during a rape in the first degree, § 13A-5-40(a)(3), Code of Alabama 1975 (charged in Count I of the indictment) and of murder of B.W.L. during a burglary in the first degree, § 13A-5-40(a)(3). The jury unanimously recommended death on Thomas's conviction under Count I and recommended, by a vote of 10 to 2, death on Thomas's conviction under Count II. The trial court subsequently sentenced Thomas to death, after considering the jury's recommendations and finding the following aggravating circumstances: that the capital offenses were committed by a person under sentence of imprisonment, as evidenced by Thomas's two prior convictions, § 13A-5-49(1); one of the capital offenses was committed while Thomas was engaged in the commission of rape, § 13A-5-49(4); ore of the capital offenses was committed while Thomas was engaged in the commission of burglary, § 13A-5-49(4); and the capital offenses were especially heinous, atrocious, or cruel compared to other capital offenses, § 13A-5-49(8). In regard to any possible mitigating circumstances, the trial court's order states: "The Court finds that the defendant chose to adopt the testimony of his mother and former wife, offered during the penalty phase, as to his family status as mitigating factors pursuant to § 13A-5-51 and § 13A-5-52." (C.R.19.)
*9 At trial, the prosecution's evidence indicated the following: The victim and her husband lived in a duplex apartment. The other apartment in the duplex was occupied by Patrick Johnson. When the victim's husband, T.L., returned home from work on the evening of August 11, 1995, he and the victim had an argument about her needing money. During this argument, T.L. grabbed her around her neck and shoved her twice, one time against a wall and one time onto the sofa. Then, after going to the next-door apartment where he apologized to Johnson for any noise during the argument, T.L. left and went to a party. He left after 8:00 p.m., wearing white pants and a white shirt.
After T.L. left, the victim went outside. She was crying. She was comforted by Johnson, along with Johnson's mother and sister. During this time, Thomas walked up to the group. Johnson had seen him in the neighborhood only once or twice; he had never seen him hanging around the victim's apartment; and he did not know his name. However, the victim appeared to know Thomas. Comforting the victim, Johnson's sister and Thomas hugged her. After Johnson's mother and sister left, Thomas and the victim walked across the street to a telephone. After the victim made a telephone call, she returned to the duplex alone and Thomas walked down the street. The victim and Johnson talked and drank beer on Johnson's front porch until about 11:30 p.m. During their conversation, the victim told Johnson that she and Thomas had attended school together. (The victim's husband testified at trial that he had never seen Thomas before.)
In the meantime, John Law[1] saw Thomas, and Thomas asked him to "get high" with him. Around 9:00 p.m., they went to William Lott's residence in Alabama Village. (Lott[2] testified that Thomas and Law arrived between 11:00 p.m. and midnight. Lott testified, "I smoke[d] crack with ... several people who come back and forth to my house." (R. 242.)) There, Thomas drank and smoked crack cocaine with Law. After 45 minutes, they left because Law "had a little job [he] had to do, but the person wasn't at home," (R. 230), so they returned again between 11:00 p.m. and 12:00 p.m. (According to Lott, they did not leave his residence this time until 12:30 a.m. or 1:00 a.m.) On this second visit, Thomas asked Law to stay at Lott's until he got back, and then Thomas left again, this time alone.
In the meantime, around 11:30 p.m. or midnight, Johnson left the duplex and walked to a friend's house around the corner. On the way, he saw Thomas walking toward the duplex. Although they passed within inches of each other and Johnson greeted him, Thomas did not acknowledge Johnson. Johnson described in his trial testimony the following series of events, which happened as he was walking back to the duplex about 12:30 a.m.:
"[I]n between the time that it take me to walk around from around the corner behind there, about halfway, I heard a lot of noise over there in our yard....
"And as I heard, I speeded up. The dog was barking real loud. I heard a loud noise.... [W]hen I got to the edge of the driveway, I said, `Who's back there?' or I said, `Hey, what's going on?'.... And at that time, the noise stopped.

*10 "So, when the noise stopped, I walked around on my side and pulled the shovel from up under the house ... and I went to the back and walked halfway down [B.W.L.'s] side and I didn't see nothing, so I walked back around the front. And when I walked back around the front, [Thomas] popped up out of nowhere.... He was breathing hard. He said, `You think [B.W.L.] was at home?' I said, `Well, she was there not too long ago when I left. You know, she told me she was going in the house and go to sleep....'"
(R. 207-08.) Johnson more specifically described the noise: "It was loud noises. I knew somebody had to be breaking into something.... It was like somebody beating, maybe beating on the door or trying to open something." (R. 211.) He also further described Thomas's physical condition when he saw him this last time: "It looked like he had been running in a marathon. It was like he was tired and his eyes was big. He was sweating. I see sweat popping off his face." (R. 244.) After Johnson answered Thomas's question about B.W.L., Thomas sat down on the duplex steps and asked Johnson for a cigarette. Johnson told him he did not have one. Johnson then went in his apartment, armed himself with a kitchen knife, went back outside, and after seeing no one, he went back inside. Johnson did not see the victim's husband's car at their apartment that night, nor did he see it there the next morning.
The victim's husband stayed at the party until around midnight. After leaving the party, he took his brother home. About 12:30 a.m., he left his brother's house. He arrived at his mother's residence at 12:55 a.m., the time noted by his sister on her clock when she saw a car drive into the driveway. (She subsequently recollected that, when he arrived that early morning, his white clothes had no blood on them, and he looked normal.) They talked for about 35 to 40 minutes until she went to bed about 1:30 a.m. Thereafter, T.L. watched a movie, and went to sleep.
In the early morning hours (around 3:00 a.m. to 4:00 a.m. according to Lott, but about 1:45 a.m. or 2:00 a.m., according to Law), Thomas returned to Lott's residence. He had, in his possession, a video-cassette recorder, a gold necklace, and a two-piece wedding band set. When he came to the door, he said, "Won't somebody come help me with this shit?" (R. 236.) He said he was going to sell the items. Lott asked, "Where did you get these this time of the night, man?" (R. 240-41.) Thomas answered, "Man, they're dead cold. They're dead asleep." (R. 241.) Thomas asked Lott if he knew anyone who would buy the items. Lott was unsuccessful at a sole attempt to sell them. Thomas thereafter left at around 2:20 a.m. (according to Law). He later returned with "some dope." Because Thomas had "dope" with him when he returned, Lott surmised that Thomas had sold the items. In the meantime, Law had gotten tired of waiting for Thomas, so he had gone to a friend's house and gone to sleep. Close to daybreak, Thomas woke Law up and wanted him to get high with him. Law declined.
At 8:00 a.m., the victim's brother arrived at the victim's home to check on her pursuant to their mother's telephone call to him. No one answered his knock on the screen door. When he knocked on the wooden door, it "flew open." (R. 260.) He entered and found the victim lying face-down on her bed. When he touched her, she was stiff. A piece of a curtain and a cord were around her neck. (Forensics collected a piece of cord from a Nintendo videogame unit from the bed.) Her panties were pulled down and were around her *11 right leg. Her shirt was pulled up around her neck. A moderate amount of blood was visible, and a knife was on the bed. After noting that the baby was asleep in her crib a few feet from her mother's body, the victim's brother went to a telephone across the street and summoned help by telephoning the emergency 911 number.
T.L. dropped his sister off at a grocery store at about 8:30 a.m. and returned home. A crowd had gathered in front of the duplex. Without being told that his wife had been murdered, he was taken to the police station and questioned. The police seized the all-white outfit he was wearing, which he had also worn the previous evening. (No bloodstains were found by a subsequent forensic examination of these clothes.) At the scene, police found the victim's purse and its contents outside by the side-door steps. What appeared to be the contents of a purse were found on the couch and on the floor in front of that couch in the living room.
After T.L. was allowed to return to his residence, he discovered the following missing: a videocassette recorder; his and the victim's tennis shoes; the victim's three rings, including her wedding rings; and a necklace. He also observed a window broken in their kitchen. Forensic scientists later noted "some window debris" inside, on the kitchen floor, and broken glass on the ground below the kitchen window and also west of the window. These pieces of glass were examined for latent fingerprints, and the six latent prints recovered matched Thomas's known fingerprints. No print belonging to Thomas was found on the knife found on the bed or anywhere in the bedroom.
An autopsy of the victim's body revealed three "relatively superficial" cuts to the victim's neck, ranging from 2 3/8 inches to 4 inches in length. (R. 272.) The forensic pathologist characterized them as "hesitation marks," which "indicated that there were maybe two or three movements of the knife in addition to the one long one that produced the wound." (R. 274.) He further concluded that they were inflicted while the victim was still alive and that "they can be used to inflict pain" (R. 275). The other injuries were indicative of ligature strangulation. The pathologist concluded that the victim died from ligature strangulation and sharp-force injuries to her neck.
DNA extracted from vaginal fluid recovered from the victim's body and from Thomas's blood were compared to determine whether Thomas could have been the source of the semen present in the victim's body. The DNA profiles from the vaginal fluid matched the DNA profiles from Thomas's blood. Statistically, the probability of finding an unrelated individual at random from the population who would match the particular DNA of the semen recovered from the victim's body is approximately 1 in 323,533,000 whites and 1 in 322,149,000 African-Americans.
A forensic examination of the victim's husband's car and the all-white outfit he was wearing the evening before and the morning after his wife's murder revealed no blood. The expert in forensic DNA profiling was provided a dried stain of the victim's husband's blood. DNA profiling excluded the victim's husband as the contributor of the semen on the vaginal swabs.
Thomas called no witnesses in his defense. However, the record shows that his theory of defense was advanced throughout the trial, beginning with opening statements and continuing through defense counsel's cross-examination of the prosecution's witnesses. His theory of defense was that the victim's husband caught him and the victim in the act consensual intercourse, *12 that he ran away to avoid an altercation with the husband, and that the husband, in a jealous rage, killed his wife.

Plain-Error Standard of Review
The scope of our review is determined by whether Thomas properly raised and preserved the issues he now asserts. All of Thomas's issues on appeal, with the exception of the issue relating to the sufficiency of evidence in regard to the murder-burglary charge, were not preserved for appellate review. However, because the death penalty was imposed in this case, we must review the record for plain error, although these issues were not brought to the trial court's attention. Rule 45A, Ala. R.App.P.[3] "Plain error is error that has or probably has adversely affected a substantial right of the appellant, Ala.R.App.P. 45A, or is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Ex parte Womack [, 435 So.2d 766 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983)]." Bush v. State, 695 So.2d 70, 87 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997).
This standard of "plain error" was adopted by the Alabama Supreme Court, from the meaning given that term by the federal courts. Id. (citing Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985); Ex parte Womack; Hooks v. State, 534 So.2d 329 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989)). Because the Alabama Supreme Court has adopted the federal courts' interpretation of the "plain-error" standard, we find it appropriate and useful in this case to consider the United States Supreme Court's "clarification" of the standard for "plain-error" review, as expressed in United States v. Olano, 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). We adopt the following interpretation of Olano.
"[In Olano, t]he Supreme Court mandated a four-part inquiry to determine whether an error may be corrected under Rule 52(b)[[4]]: (1) there must be *13 error; (2) it must be plain; and (3) it must affect substantial rights. Olano, 507 U.S. at 732-35, 113 S.Ct. at 1776-78. Even after a reviewing court finds plain error under this three-part rubric, relief remains discretionary under Olano's fourth and final requirement. Id. at 735-37, 113 S.Ct. at 1778-80. `The Court of Appeals should correct a plain forfeited error affecting substantial rights if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."` Id. at 736, 113 S.Ct. at 1779 (quoting United States v. Atkinson, 297 U.S. [157,] 160, 56 S.Ct. [391,] 392[, 80 L.Ed. 555 (1936)]).
"1. Was There Error?
"An error occurs when there has been a deviation from a legal rule, unless the rule has been waived. Olano, 507 U.S. at 732-33, 113 S.Ct. at 1776-77.
"2. Was the Error Plain?
"An error is plain when it is `clear' or `obvious' under the law. Olano, 507 U.S. at 734, 113 S.Ct. at 1777-78. See also Johnson [v. United States], 520 U.S. [461,] 468[, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) ] (error not clear at time of trial, but `"plain" at time of appellate consideration,' may qualify as `plain' error under Olano).
"3. Did the Error Affect Substantial Rights?
"In the context of plain error review, for an error to affect substantial rights, `in most cases it means that the error must have been prejudicial[: It must have affected the outcome of the District Court proceedings].' Olano, 507 U.S. at 734, 113 S.Ct. at 1778. `Normally, although perhaps not in every case, the defendant must make a specific showing of prejudice to satisfy the "affecting substantial rights" prong of Rule 52(b).' Id. at 735, 113 S.Ct. at 1778. Olano contains these cautionary statements (i.e., `in most cases' and `normally') in recognition of the fact that there the Court was dealing with a mere rule violation and not a deprivation of a constitutional right. These statements suggest that there may be some cases, such as those involving the violation of certain constitutional rights, in which prejudice may not have to be shown.
". . . .
"... [W]e need not [necessarily always] make the difficult determination of whether [the error] was prejudicial, or `whether the phrase "affecting substantial rights" is always synonymous with "prejudicial."` Olano, 507 U.S. at 735, 113 S.Ct. at 1778 (citing Arizona v. Fulminante, 499 U.S. 279, 310[, 111 S.Ct. 1246, 113 L.Ed.2d 302] (1991)). Instead, we [may] follow the teaching of Johnson:

"`But we need not decide that question because, even assuming that the [error] "affec[ted] substantial rights," it does not meet the final requirement of Olano.'
"520 U.S. at 469[, 117 S.Ct. 1544].
"4. Does the Error `Seriously Affect the Fairness, Integrity or Public Reputation of Judicial Proceedings'?

*14 "In conducting our review of this element, `we consider all circumstances at trial including the strength of the evidence against the defendant.' United States v. Campbell, 42 F.3d 1199, 1204 (9th Cir.1994), cert. denied, 514 U.S. 1091[, 115 S.Ct. 1814, 131 L.Ed.2d 738] (1995) (internal quotation omitted)."
United States v. Perez, 116 F.3d 840, 846-47 (9th Cir.1997). We find that our appellate authority to grant appropriate relief under "plain-error" review is likewise so circumscribed.
Particularly in regard to the record before us, the following discussion, by Judge Ed Carnes of the United States Court of Appeals for the Eleventh Circuit, most effectively explains the rationale behind such circumscription of the "plain-error" standard of review. We endorse it whole-heartedly.
"The narrowness of the plain error rule is a reflection of the importance, indeed necessity, of the contemporaneous objection rule to which it is an exception. The contemporaneous objection rule fosters finality of judgment and deters `sandbagging,' saving an issue for appeal in hopes of having another shot at trial if the first one misses. See, e.g., Esslinger v. Davis, 44 F.3d 1515, 1525 and n. 36 (11th Cir.1995) (contemporaneous objection rule `deters "sandbagging," the withholding of claims in an effort to get more than "one bite at the apple."'); United States v. Joshi, 896 F.2d 1303, 1307 and n. 3 (11th Cir.1990) (noting `the Supreme Court's "admonition against `sandbagging' on the part of defense lawyers" who intentionally decline to object to a potentially unconstitutional trial procedure in order to inject reversible error into the proceeding.'); Spencer v. Kemp, 781 F.2d 1458, 1473 (11th Cir.1986) (`contemporaneous objection rules prevent a defendant from "sandbagging," taking a chance on a jury verdict while reserving his claim in the event of an unfavorable verdict').
"The contemporaneous objection rule also promotes the salutary interest of making the trial the main event. Failure to enforce it `tends to detract from the perception of the trial of a criminal case ... as a decisive and portentous event.' Wainwright v. Sykes, 433 U.S. 72, 90[, 97 S.Ct. 2497, 53 L.Ed.2d 594] (1977). Moreover, requiring timely objections allows the trial courts to develop a full record on the issue, consider the matter, and correct any error before substantial judicial resources are wasted on appeal and then in an unnecessary retrial. See United States v. Sorondo, 845 F.2d 945, 948-49 (11th Cir.1988). A full record and a prior decision in the district court are essential ingredients to our substantive review of the issues they flesh out an issue in a way the parties' briefs may not.
"`In the absence of plain error ... it is not our place as an appellate court to second guess the litigants before us and grant them relief they did not request, pursuant to legal theories they did not outline, based on facts they did not relate.' Adler v. Duval County School Bd., 112 F.3d 1475, 1481 n. 12 (11th Cir.1997). Because the contemporaneous objection rule is essential to the integrity and efficiency of our judicial process, we have stressed that `[t]he plain error test is difficult to meet.' United States v. King, 73 F.3d 1564, 1572 (11th Cir.1996); accord, e.g., United States v. Sorondo, 845 F.2d at 948-49; United States v. Chaney, 662 F.2d 1148, 1152 n. 4 (5th Cir. Unit B 1981)."
United States v. Pielago, 135 F.3d 703, 709 (11th Cir.1998).
"While the plain error doctrine lessens the blow of a rigid application of the *15 contemporaneous objection requirement, it is to be used sparingly, since the unwarranted extension of the exacting definition of plain error would skew the rule's careful balancing of the need to encourage all trial participants to seek a fair and accurate trial the first time around against the insistence that obvious injustice be promptly redressed. Reviewing courts are not to use the plain error doctrine to consider trial court errors not meriting appellate review absent timely objection."
5 Am.Jur.2d Appellate Review § 767, p. 437 (1995). See also Ex parte Woodall, 730 So.2d 652, 657 (Ala.1998) (the plain-error exception is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result") (internal quotes and citations omitted).
One of the factors for the reviewing court to consider in its determination of whether an alleged error constitutes plain error is "whether a proper and timely objection at trial would have cured the error or would have enabled the trial court to prevent injustice." 5 Am.Jur.2d, supra, at § 774, p. 443-45 (footnotes omitted). "[T]he doctrine [of plain error] is less likely to be applied where the error could have been readily corrected by an objection at trial, or where such an objection may have led the government to introduce additional evidence on the issue." Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 27.5(d), p. 1160 (2nd ed.1992). See, e.g., United States v. Hayes, 589 F.2d 811, 825 (5th Cir.) ("Rule 52(b) will not be used to allow counsel for the defendant to gamble first on acquittal and then, upon conviction, to raise on appeal any matters which could have been easily remedied at trial."), cert. denied, 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979). See also Jones v. United States, 527 U.S. 373, 386, 119 S.Ct. 2090, 2101, 144 L.Ed.2d 370 (1999) (preservation-of-error requirements "enable a trial court to correct any instructional mistakes before the jury retires and in that way help to avoid the burdens of an unnecessary retrial"). Thus, "a failure to object at trial, while not precluding our review, will weigh against any claim of prejudice. Kuenzel v. State, 577 So.2d 474 (Ala.Cr. App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886[, 112 S.Ct. 242, 116 L.Ed.2d 197] (1991)." Ex parte Woodall, 730 So.2d at 652.

I.
Thomas complains that his rights to due process and a fair trial were violated by the admission of a fingerprint card with his known fingerprints (State's Exhibit 31). This card was used by fingerprint expert Mary Sue Manci to arrive at her opinion that the fingerprints found at the crime scene matched Thomas's, and she so testified. Thomas argues, "[T]he fingerprint card apprised the jury that [he] had been in prior difficulties with the law and constituted improper evidence of his bad character." (Appellant's Brief, p. 34.) He contends that information on the card "explicitly stated" that he had been arrested on September 17, 1992, almost three years before the commission of the capital offense.
In addition to Thomas's fingerprints, the card contained his name and signature, an alias ("Tank"), his date and place of birth, his physical description, and his Social Security number. Below the signature blank appeared the sentence: "THIS DATA MAY BE COMPUTERIZED IN LOCAL, STATE AND NATIONAL FILES." The card also contained the name of the "OFFICIAL" who took the fingerprints and the following information blocks with the information supplied as indicated: "DATE ARRESTED OR RECEIVED DOA" *16 "09-17-92"; "YOUR NO. OCA" "C0062417"; "FBI NO."[blank]; "SID NO."[blank]; "CAUTION"[blank]; "STATE USAGE"[blank]; "NCIC CLASSFPC"[blank]; "CONTRIBUTOR" "AL0020000 SO MOBILE, AL."; "CLASS." [blank]; "REF."[blank]; and "FBI"[blank]. (R. 531.) There was no reference to the charge of any offense.
The only testimony regarding Thomas's fingerprint card was that of Manci. Her testimony pertinent to this issue, is as follows:
"Q. [Prosecutor]: In this case, were you provided with what I'll call some known fingerprints?
"A. Yes, I was.
"Q. And can you tell us specifically from whom? Not who brought them to you, but whose fingerprints you were provided with?
"A. Billy Jack Thomas.
". . . .
"Q. I'm going to show you what I have marked as State's Exhibit Number 31. Mr. Stamp [defense counsel]? Having previously shown it to Mr. Stamp, I'll ask you if this is the fingerprint file that you
"A. Yes. My initials are at the top."
(R. 308-09.) Following this testimony, when Exhibit 31 was offered into evidence, along with several other exhibits, defense counsel stated, "No objection to any of that, Your Honor."
In asserting plain error, Thomas relies on Ex parte Johnson, 507 So.2d 1351 (Ala. 1986), rev'g 507 So.2d 1337 (Ala.Cr.App. 1985), wherein the Alabama Supreme Court reversed Johnson's capital murder conviction and death sentence on its finding that the admission into evidence of a fingerprint card of Johnson's was plain error. In addition to showing Johnson's full name, his two aliases (which were "simply versions of the principal name shown"), and the date the prints were taken,[5] the information on the front of the "police fingerprint card" included the following: "`At the left of one of the blanks on the card are the letters "FBI" and thereafter are printed the numerals and letter constituting the FBI identification number. To the left of another blank are the words "Police No." and following that are a typed number and five handwritten numbers.'" 507 So.2d at 1354. The Alabama Supreme Court found that the front of the card "contained information which clearly revealed the defendant's past contacts with law enforcement agencies," from which "the jury could have readily inferred, at a minimum, that he had been arrested in the past." 507 So.2d at 1357 (emphasis added). In considering Johnson, we also find significant the testimony of the officer who took Johnson's prints and whose signature was on the front of the card: "[O]ne of [his] duties at the city jail was to take inked fingerprints," and Johnson's "prints were made in the ordinary course of business of fingerprinting people at the Birmingham City Jail and were kept by the Birmingham Police Department in its Identification Bureau." 507 So.2d at 1341.
*17 In reversing the Court of Criminal Appeals' holding that the admission of Johnson's fingerprint record did not rise to plain error, the Alabama Supreme Court cited Brown v. State, 369 So.2d 881 (Ala. Cr.App.1979). In Brown, the court reversed the judgment, based on the (preserved) trial court's error in admitting into evidence the appellant's fingerprint card. The court held: "The extraneous information contained on the exhibit reasonably implied the existence of a prior criminal record of the appellant." Id. at 884. The information included the arrest date (one year before the offense for which he was on trial), five aliases, and an FBI identification number. We find it also significant that the officer who took the appellant's prints testified that "the general procedure of being admitted to jail involved being fingerprinted" and that the appellant "had been admitted to jail and fingerprinted `about a year or two ago.'" Id. at 883.
In addition, in reversing this court's determination that there was no plain error, the Court in Ex parte Johnson distinguished the circumstances before it from those in United States v. Richardson, 562 F.2d 476 (7th Cir.1977), upon which this court had relied. In Richardson, the question was whether plain error had occurred upon the receipt into evidence of a photograph of Richardson's "FBI file card of his palm print, which contains a blank printed form, the reverse side captioned, `BOB TURNER, SheriffOKLAHOMA COUNTY BUREAU OF IDENTIFICATION,' and which includes spaces for identification information such as `FBI No.,' `Date of Arrest,' `Crime,' and `Sentence.'" Id. at 478. After recognizing that "[t]he plain error rule is of particular significance here because the error complained of could have been easily corrected at the time of the admission of the evidence by covering the extraneous information on the exhibits," id., the court continued,
"[T]he material on the reverse side of the card implies that Richardson had past contacts with a law enforcement agency. From this the jury could infer, at a minimum, that he had been arrested in the past. Evidence that manifests such an implication of past criminal behavior could have prejudiced Richardson and would, if presented independently, have been inadmissible because Richardson did not put his character into issue at trial.
"While the submission of the reverse side of the palm print card to the jury possibly could have been somewhat prejudicial to Richardson, we do not think that the possible prejudice engendered was severe enough to constitute plain error. [T]here was no emphasis put on the potentially prejudicial aspect of the exhibit. No testimony accompanied the admission of the exhibit that might have focused the jury's attention on its potentially prejudicial aspects ..., nor did the judge unduly focus the jury's attention on the exhibit by engaging in a discussion about how the photos should be covered in front of the jury.... More important, none of the identifying information such as `FBI No.,' `Date of Arrest,' `Crime,' or `Sentence' was filled in, and the nature of the defendant's prior contact with Oklahoma law enforcement officials was oblique. Accordingly, we believe the possibility of prejudice that resulted from submission of the reverse side of the palm print card was remote. Moreover, any possible prejudice easily could have been prevented by defense counsel if he had objected to the submission at trial. In view of the above, we hold that the submission of the card was not plain error affecting substantial rights of the defendant within the meaning of Rule 52 of the Federal Rules of Criminal Procedure."
*18 Id. at 479, quoted in Ex parte Johnson, 507 So.2d at 1356-57 (emphasis added in Johnson).
In applying this caselaw to the circumstances before us, we recognize, "Each case of alleged error in the admission of a fingerprint record taken pursuant to another criminal offense and prior to the charge for which the accused is presently on trial must be judged upon its own merits." Buchannon v. State, 554 So.2d 477, 480 (Ala.Cr.App.) (quoting Woodson v. State, 405 So.2d 967, 969 (Ala.Cr.App.), cert. denied, 405 So.2d 969 (Ala.1981)), cert. denied, 554 So.2d 494 (Ala.1989), overruled on other ground by Pardue v. State, 571 So.2d 333 (Ala.1990). We start with the premise that "[t]he mere existence of recorded fingerprints does not per se imply the existence of a criminal record." Brown, 369 So.2d at 884.
The circumstances of this case are clearly not as compelling as those of Johnson and Brown. Unlike the card in Johnson, which showed six separate numbers designated as "Police No.," Thomas's card did not even have an information block designated "Police No." Unlike the cards in Johnson and Brown, Thomas's card did not show a number in the block designated for the "FBI" number. The only completed block on Thomas's card calling for a number was the one designated "YOUR NO. OCA." However, the evidence offers no explanation as to any significance of that number, and we find none to be obvious. Thomas asserts that two handwritten numbers at the top of the card could have readily been inferred as signifying police numbers. We disagree. One was the same number provided in the block "YOUR NO. OCA." The other was the case number assigned the pieces of evidence in this case that were processed through the Alabama Department of Forensic Sciences. Thus, Thomas's card did not contain numbers that could have been interpreted to indicate several previous contacts with law enforcement. We reject Thomas's assertion that his card "contained the same type of police numbers condemned in Johnson." (Appellant's Brief, p. 35.) In addition, unlike the card in Brown, which indicated five aliases, Thomas's card showed only one, "Tank," and it signified nothing more than a nickname. We are further impressed by the absence here of any prejudicial testimony regarding where, why, and under what circumstances Thomas's prints were taken. In both Johnson and Brown, an officer testified as to having taken the prints in the jail, and the officer in Brown specifically testified that the appellant had been admitted to the jail. The testimony in Thomas's trial was devoid of any implication that Thomas's prints had been taken during a prior arrest. Moreover, Thomas's card denominated the taker of the prints as an "OFFICIAL," not a police officer. The information on the card would not even support an inference that a law enforcement officer had taken his prints.
Rather, we find that the circumstances before us are somewhat more innocuous than those of Richardson. In Richardson, the printed form was captioned, "BOB TURNER, SheriffOKLAHOMA COUNTY BUREAU OF IDENTIFICATION." The court in Richardson found that this caption and the empty blocks asking for the FBI number, date of arrest, crime, and sentence implied that Richardson had had past contacts with a law enforcement agency. Here, the circumstances do not support such an implication as strongly: Thomas's card was not clearly designated to be that procured by a law enforcement agency. In so finding, we also find that the evidence did not indicate, nor is it "obvious," as Thomas argues, that "SO MOBILE, AL" in the block "CONTRIBUTOR" *19 is the designated abbreviation for "Sheriff's Office."
However, assuming, arguendo, that the information asked for on Thomas's card (but not necessarily supplied in this case) implies that such a card is used by a law enforcement agency, which, in turn, implies that Thomas had past contact with a law enforcement agency, and that such contact implies that he had been arrested in the past, we find that the circumstances before us support the conclusion reached by the court in Richardson: "While the submission of the ... card to the jury possibly could have been somewhat prejudicial to [the defendant], we do not think that the possible prejudice engendered was severe enough to constitute plain error." 562 F.2d at 478. Compare Woodson v. State, 405 So.2d 967, 968-69 (Ala.Cr. App.) (the trial court did not err in admitting the defendant's fingerprint card, which did not indicate that it was in any way connected with a criminal charge against the defendant other than the fact that it was a fingerprint record made by the police department; "The date (even if it is before the offense involved in the trial) and the place of taking (the police department) need not be eliminated from the fingerprint record before the card is introduced into evidence."), cert. denied, 405 So.2d 969 (Ala.1981). As in Richardson, no testimony or attention by the trial court emphasized any alleged potential prejudicial aspect of the card. More importantly, like the card in Richardson, Thomas's card contained no identification informationsuch as a specific crime, sentence, or FBI number. (As is apparent from the emphasis added by the Johnson court in quoting Richardson, 507 So.2d at 1357, the Alabama Supreme Court also noticed that no such identifying information had been filled in on the card in Richardson.)
In an effort to distinguish his card from the card in Richardson, which did not have a date for the blank "DATE ARRESTED," Thomas asserts that his card "explicitly stated" that he was arrested on September 17, 1992, the date in the block "DATE ARRESTED OR RECEIVED." We find that, by the ambiguity of the caption for the block, the nature of Thomas's presumed contact with law enforcement authorities was "oblique." See Richardson. Cf. McNair v. State, 653 So.2d 320, 341 (Ala.Cr.App.1992) (in holding that the prosecutor did not commit plain error by commenting in closing argument that McNair had stated in an extrajudicial statement that he had been in "a little bit [of trouble] down in Florida," the court noted that, because of its brevity and vagueness, the comment did not "lead to a clear inference of past criminal activity"), aff'd, 653 So.2d 353 (Ala.1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995). We find that Johnson`s critical holding does not apply to the circumstances here; Thomas's card did not contain information that "clearly revealed the defendant's past contacts with law enforcement agencies," from which "the jury could have readily inferred, at a minimum, that he had been arrested in the past." 507 So.2d at 1357 (emphasis added). Compare also Buchannon v. State, 554 So.2d at 480 (harmless error to admit fingerprint card where it showed Buchannon's FBI and SID numbers, the signature of the person who made the prints, and the date the prints were taken, which was 10 weeks before the commission of the offense for which he was on trial, and where the word "Charge" remained visible, although the prosecution had tried to obscure the arrest information with small pieces of paper taped to the card, "so that the piece of paper appear[ed] to (and obviously [did]) cover information related thereto").
*20 Any error here was not plain error. It was not "clear" or "obvious" under the law. See Olano. This finding is buttressed by the fact that defense counsel apparently did not notice any allegedly potentially prejudicial information on the card when he viewed it, as disclosed by the record. (In so finding, we are not implying that defense counsel waived any error by failing to object. See Ex parte Johnson, 507 So.2d at 1358 (waiver cannot be implied from an assumption that defense counsel was fully aware of the contents of the exhibit where the record offers the "equally compelling inference" that counsel simply did not recognize the error).) Moreover, the prosecutor never attempted to imply that Thomas in fact had a criminal record.
In addition, Thomas has failed to meet his burden of making a specific showing of prejudice that would satisfy the "affecting substantial rights" prong of Olano. Looking at all the circumstances, we adopt the finding of the court in Richardson: we believe the possibility of prejudice that resulted from the admission of the fingerprint card was remote. Moreover, the testimony at trial contained references, properly admitted into evidence, to Thomas's illegal drug activity. See Ex parte Dill, 600 So.2d 372, 373 (Ala.1992) (the Alabama Supreme Court, in finding that the reference by "an officer of considerable law enforcement experience" to his attempt to locate the defendant "through [the defendant's] parole officer" did not constitute plain error, considered the fact that the record contained repeated references, properly in evidence, to drug sales and other illegal activity on the part of the defendant), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993). It is inconceivable that a jury could have been influenced, under the circumstances here, to convict Thomas of crimes of the magnitude charged here because of an oblique reference to a prior criminal record. "Whether the [state] could have met its burden of showing the absence of prejudice, under [harmless error], if [Thomas] had not forfeited [his] claim of error, is not at issue here. This is a plain-error case, and it is [Thomas] who must persuade the appellate court that the [plain error] was prejudicial." Olano, 507 U.S. at 741, 113 S.Ct. 1770. Even assuming the alleged error was plain and that it affected Thomas's substantial rights, it does not meet the final requirement of Olano. Under the circumstances here, such an error would not have seriously affected the fairness, integrity, or public reputation of the judicial proceedings. See also Johnson v. United States, 520 U.S. 461, 117 S.Ct. 1544 (1997).
Finally, we emphasize that we have reviewed this claim under "the stringent requirements applicable to the plain error rule." Ex parte Dill, 600 So.2d at 373 (in finding that a witness's reference to his attempt to locate the defendant "through [the defendant's] parole officer" did not constitute plain error, the Alabama Supreme Court noted that its conclusion was supported only by its consideration of "the stringent requirements applicable to the plain error rule" and "the particular facts of this case," including the facts that the reference to the defendant's parole officer was incidental and not the main point of the witness's testimony, that the reference was not repeated or highlighted in later testimony, and that the record contained repeated references, properly in evidence, to drug sales and other illegal activity on the part of the defendant). As the court in Richardson stated, "The plain error rule is of particular significance here because the error complained of could have been easily corrected at the time of the admission of the evidence by covering the extraneous information on the exhibits." Id. at 478. *21 See also Plain-Error Standard of Review, supra.
Based on the foregoing, we find that the circumstances do not compel a finding of plain error in the admission into evidence of Thomas's fingerprint card.

II.
Thomas contends that the following comments by the prosecutor during his opening statement were comments on Thomas's failure to testify:
"Now, [the victim] is obviously not alive to tell us what this Defendant did to force her to have sex with him. So, the law allows you in several places to infer intent because we will never know what goes on in the mind of someone like Billy Thomas. So, you can infer the intent to commit the crime through the facts and circumstances surrounding it."
"[T]he reason I tell you that[, but for the forensic experts' evidence, the victim's husband would still be the prime suspect] is because as a prosecutor what you attempt to do is anticipate defenses. And in this case, the State believes you might hear evidence thatfrom the Defense that [Thomas and the victim] knew each other. And understand the Defendant doesn't have to testify. He has to present no evidence. But through certain forms of testimony you might hear them try and assert that he knew her and that sex was consensual and that maybe [T.L.] came home and found her with Billy and maybe [T.L.] killed her."
(R. 135, 152) (emphasis added by Thomas).
The law governing our review is stated by the Alabama Supreme Court, as follows:
"In all criminal prosecutions, the accused shall not be compelled to give evidence against himself. Alabama Constitution, Art. I, § 6.
"`On the trial of all indictments, complaints or other criminal proceedings, the person on trial shall, at his own request, but not otherwise, be a competent witness, and his failure to make such a request shall not create any presumption against him nor be the subject of comment by counsel. If the district attorney makes any comment concerning the defendant's failure to testify, a new trial must be granted on motion filed within 30 days from entry of the judgment.'
"Ala.Code 1975, § 12-21-220; see also Ex parte Wilson, 571 So.2d 1251, 1261 (Ala.1990); Ex parte Yarber, 375 So.2d 1231, 1233 (Ala.1979); Whitt v. State, 370 So.2d 736, 738-39 (Ala.1979).
"Comments by a prosecutor on a defendant's failure to testify are highly prejudicial and harmful, and courts must carefully guard against a violation of a defendant's constitutional right not to testify. Whitt, supra, at 739; Ex parte Williams, 461 So.2d 852, 853 (Ala.1984); see Ex parte Purser, 607 So.2d 301 (Ala. 1992). This Court has held that comments by a prosecutor that a jury may possibly take as a reference to the defendant's failure to testify violate Art. I, § 6, of the Alabama Constitution of 1901. Ex parte Land, 678 So.2d 224 (Ala.), cert. denied, 519 U.S. 933[, 117 S.Ct. 308, 136 L.Ed.2d 224] (1996); Ex parte McWilliams, 640 So.2d 1015 (Ala. 1993); Ex parte Wilson, supra; Ex parte Tucker, 454 So.2d 552 (Ala.1984); Beecher v. State, 294 Ala. 674, 320 So.2d 727 (1975). Additionally, the Fifth and Fourteenth Amendments of the United States Constitution may be violated if the prosecutor comments upon the accused's silence. Griffin v. California, 380 U.S. 609[, 85 S.Ct. 1229, 14 L.Ed.2d 106] (1965); Ex parte Land, supra; Ex parte Wilson, supra. Under federal law, *22 a comment is improper if it was `"`manifestly intended or was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'"' United States v. Herring, 955 F.2d 703, 709 (11th Cir.), cert. denied, 506 U.S. 927[, 113 S.Ct. 353, 121 L.Ed.2d 267] (1992) (citations omitted); Marsden v. Moore, 847 F.2d 1536, 1547 (11th Cir.), cert. denied, 488 U.S. 983[, 109 S.Ct. 534, 102 L.Ed.2d 566] (1988); United States v. Betancourt, 734 F.2d 750, 758 (11th Cir.), cert. denied, 469 U.S. 1021[, 105 S.Ct. 440, 83 L.Ed.2d 365] (1984). The federal courts characterize comments as either direct or indirect, and, in either case, hold that an improper comment may not always mandate reversal.
"Consistent with this reasoning, Alabama law distinguishes direct comments from indirect comments and establishes that a direct comment on the defendant's failure to testify mandates the reversal of the defendant's conviction, if the trial court failed to promptly cure that comment. Whitt v. State, supra; Ex parte Yarber, supra; Ex parte Williams, supra; Ex parte Wilson, supra. On the other hand, `covert,' or indirect, comments are construed against the defendant, based upon the literal construction of Ala.Code 1975, § 12-21-220, which created the `virtual identification doctrine.' Ex parte Yarber, 375 So.2d at 1234. Thus, in a case in which there has been only an indirect reference to a defendant's failure to testify, in order for the comment to constitute reversible error, there must have been a virtual identification of the defendant as the person who did not become a witness. Ex parte Yarber, 375 So.2d at 1234; Ex parte Williams, supra; Ex parte Wilson, supra; Ex parte Purser, supra. A virtual identification will not exist where the prosecutor's comments were directed toward the fact that the State's evidence was uncontradicted, or had not been denied. See Beecher v. State, 294 Ala. 674, 682, 320 So.2d 727, 734 (1975); Ex parte Williams, supra; Ex parte Purser, supra. Yet, in such circumstances, it becomes important to know whether the defendant alone could have provided the missing evidence.
"A challenged comment of a prosecutor made during ... arguments must be viewed in the context of the evidence presented in the case and the entire ... arguments made to the juryboth defense counsel's and the prosecutor's. Ex parte Land, supra; Windsor v. State, 683 So.2d 1021, 1023 (Ala.1994); Ex parte Musgrove, 638 So.2d 1360, 1368 (Ala.1993), cert. denied, 513 U.S. 845[, 115 S.Ct. 136, 130 L.Ed.2d 78] (1994)."
Ex parte Brooks, 695 So.2d 184, 188-89 (Ala.) (footnotes omitted), cert. denied, 522 U.S. 893, 118 S.Ct. 233, 139 L.Ed.2d 164 (1997), quoted in Ex parte Clark, 728 So.2d 1126, 1130-31 (Ala.1998).
In United States v. Knowles, 66 F.3d 1146 (11th Cir.1995), cert. denied, 517 U.S. 1149, 116 S.Ct. 1449, 134 L.Ed.2d 568 (1996), more specifically addressing the alternative criteria for a comment to be improper the comment was (1) manifestly intended to be a comment on the defendant's failure to testify or (2) of such character that the jury would have naturally and necessarily taken it to be a comment on the defendant's failure to testifythe court stated:
"`The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury necessarily would have done so.' [United States v. Swindall, 971 F.2d 1531, 1552 (11th Cir.1992), cert. denied, 510 U.S. 1040[, 114 S.Ct. 683, *23 126 L.Ed.2d 650] (1994) (citations omitted) (emphasis in Swindall).] `The defendant bears the burden of establishing the existence of one of the two criteria.' [United States v. Muscatell, 42 F.3d 627, 632 (11th Cir.), cert. denied, 515 U.S. 1162[, 115 S.Ct. 2617, 132 L.Ed.2d 859] (1995).] The comment must be examined in context, in order to evaluate the prosecutor's motive and to discern the impact of the statement. [Id.]"
66 F.3d at 1163.
In our review of the propriety of a comment, we also take note of the trial court's role, as expressed in United States v. Watson, 866 F.2d 381, 386 (11th Cir. 1989):
"[T]he person responsible for answering [the] question [of whether the comment was manifestly intended or was of such character that a jury would naturally and necessarily take it to be a comment on the defendant's failure to testify] in the first instance is the trial judge, for only the trial judge has the opportunity to observe the prosecutor's demeanor firsthand. We therefore review only for abuse of discretion the trial judge's determination of whether manifest intent was present. See Williams v. Wainwright, 673 F.2d 1182, 1185 (11th Cir. 1982) (trial court's decision is only to be reversed if the jury would have necessarily viewed the prosecutor's comments as manifestly intended to be a comment on the defendant's refusal to testify); United States v. Pool, 660 F.2d 547, 561 (5th Cir. Unit B Nov.1981) (trial court has broad discretion to control closing argument)."
The fact that the prosecutor made the contested comments during his opening statement does not prevent the remarks from being comments on Thomas's failure to testify. Ex parte Purser, 607 So.2d 301, 303 (Ala.1992).
"It does not matter that during the opening statement the accused has or has not taken the stand, his constitutional right to remain silent may still be violated. The argument that no harm can be ascertained from remarks indifferent to that right until closing arguments, after the accused has elected not to testify is ill conceived and ill thought out. Certainly, we would be remiss in our duty if we failed to recognize the danger of the district attorney, early in the proceedings, directly or indirectly focusing the jury's attention on what the accused will or will not testify to, or on what he previously has or has not admitted. In many instances, if this tactic were allowed, the prejudice to the accused would be even greater than if the comment were made after all the testimony had been taken. If permitted, the jury would be on their constant guard, anticipating the accused's `chance to tell his story.' This form of prejudice to an accused's right to receive a fair trial will not be sanctioned or tolerated by this court. An accused's right to remain silent is inviolable at every stage in the proceedings and must be afforded due protection."
Collins v. State, 385 So.2d 993, 1001 (Ala. Cr.App.1979), rev'd on other grounds, 385 So.2d 1005 (Ala.1980), quoted in Ex parte Purser, 607 So.2d at 303.
In considering these contested comments in the proper context, we note that, before opening and closing arguments, the trial court instructed the jury that what the attorneys say is not evidence. Jurors are presumed to follow the trial court's instruction.
We review the contested comments under the plain-error standard: Thomas failed to object to any of the challenged comments. Although such a failure *24 does not prevent our review, "the failure to object should be weighed as part of our evaluation of the comments, because the failure to object may suggest that the defense did not consider the comments to be particularly harmful. Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985)." Ex parte Payne, 683 So.2d 458, 465 (Ala.1996), cert. denied, 520 U.S. 1146, 117 S.Ct. 1319, 137 L.Ed.2d 481 (1997). See, e.g., Ex parte Land, 678 So.2d 224, 233, n. 2 (Ala.) ("We further note that the lack of a contemporaneous objection by experienced counsel leads this Court to believe that the prosecutor's comment was not stated with an inflection or tone that would have naturally led a listener to construe it as a reference to Land's failure to testify."), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996).
With these principles before us, we turn to the allegedly improper comments.
A.
"Now, [the victim] is obviously not alive to tell us what this Defendant did to force her to have sex with him. So, the law allows you in several places to infer intent because we will never know what goes on in the mind of someone like Billy Thomas. So, you can infer the intent to commit the crime through the facts and circumstances surrounding it."
(R. 135) (emphasis added by Thomas).
In addressing whether this argument amounted to plain error, we have considered the following:
"`Every time a prosecutor stresses a failure to present testimony, the facts and circumstances must be closely examined to see whether the defendant's right to remain silent has been violated.' Windsor v. State, 593 So.2d 87, 91 (Ala. Cr.App.1991), quoting Padgett v. State, 45 Ala.App. 56, 223 So.2d 597, 602 (1969). `In a case where there has been only an indirect reference to a defendant's failure to testify, in order for the comment to constitute reversible error, there must be a close identification of the defendant as the person who did not become a witness.' Windsor v. State, [593 So.2d at 91] quoting, Ex parte Williams, 461 So.2d 852 (Ala.1984). There are many Alabama cases which have been reversed because prosecutors have pointed out that the only remaining witness to the crime was the defendant thus indirectly commenting on the defendant's right to remain silent. In Ex parte Purser, 607 So.2d 301 (Ala. 1992), the defendant's conviction was reversed based on the following comment by the prosecutor in opening statements: `[The victim is] the only one out there... when it all happens, and she can tell you what happened. Well, excuse me. She's not the only one, other than [the deceased victim], who is no longer with us, and Allen Purser, who is on trial for [murder and attempted murder.]' Likewise, in Whitt v. State, 370 So.2d 736, 737 (Ala.1979), the Court found the following to be an impermissible comment on the defendant's failure to testify: `The only person alive today that knows what happened out there that night is sitting right there.'"
Burgess v. State, 827 So.2d 134, 167-68 (Ala.Cr.App.1998) (in a death-penalty case, the following comment was not an indirect comment on the defendant's failure to testify: defendant's statement about the way the shooting occurred was "nothing but a lie, just a complete and absolute lie, because we've got nobody else that was there to see that") (emphasis in original).
We do not find the argument under review here to be as plainly erroneous as the comments in Ex parte Purser and *25 Whitt v. State. The comments in these two noncapital cases, which explicitly pointed out that the defendant was the only or one of two living witnesses to the crime, were objected to. Here, the prosecutor made the contested comments in his explanation of what the prosecution had to prove to support guilty verdicts. When viewed in context, the comments were manifestly intended as a reference, not to Thomas's failure to testify, but to the impossibility of producing direct evidence of Thomas's intent and to the fact that the only way to prove intent was to refer to Thomas's actions. See Windsor v. State, 683 So.2d 1021, 1023-24 (Ala.1994) (the trial court properly overruled the defendant's objection to the following comment by the prosecutor, in a capital guilt-phase closing argument, pertaining to the prosecution's burden to prove intent: "If we could get into that mind over there and put out here what is in there, we would have no reason for a jury."), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997). Cf. Roberts v. State, 735 So.2d 1244, 1253 (Ala.Cr.App.1997) (the following, in a death-penalty case, was not an impermissible comment, but rather raised the legitimate point, i.e., that even though the prosecution could not establish a motive for the murder, it could nonetheless establish the defendant's guilt: "Now, I'm sure y'all are all asking yourself as I'm asking [myself]: `Why did he do it?' ... [W]e can't lift off the top of [the defendant's] head, as was done to the victim in this case, and pull out of his mind why he did what he did."), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 538 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999).
We recognize that the contested comments specifically refer to Thomas's intent rather than to intent generally. Compare Ivery v. State, 686 So.2d 495, 516 (Ala.Cr. App.1996) (the following, in a death-penalty case, was not an impermissible comment on the defendant's failure to testify: "The Judge will charge you that intent is a mental operation which must be inferred from circumstances. Because no one, not even a psychologist or a psychiatrist, can look into the mind of another human being."); Woods v. State, 641 So.2d 316, 319 (Ala.Cr.App.1993) (in rejecting the appellant's argument that the trial court should have granted a mistrial on the ground that the prosecutor commented on the appellant's failure to testify when explaining that intent is rarely proven by direct evidence, the court noted that the prosecutor made no specific reference to the appellant), cert. denied, 513 U.S. 934, 115 S.Ct. 331, 130 L.Ed.2d 290 (1994).
However, under Burgess and Windsor, the contested comments here do not rise to the level of plain error, as defined by Olano. We do not think the prosecutor manifestly intended his argument as a suggestion that the jury treat Thomas's silence as substantive evidence of guilt. In the larger context, the jurors would have necessarily interpreted the comments as an explanation of the prosecution's burden in regard to the element of intent. Thus, we think that they did not have the impact Thomas now argues. Evidently, neither did his trial counsel, since he did not object. Moreover, "[t]he plain error rule requires not only that the claimed error seriously affected substantial rights of the defendant, but also that the error had an unfair prejudicial impact on the jurors' deliberations. United States v. Young, 470 U.S. 1[, 105 S.Ct. 1038, 84 L.Ed.2d 1] (1985)." Ex parte Payne, 683 So.2d at 464-65.
Even if we construed the first comment "Now, the victim is obviously not alive to tell us what this Defendant did to force her to have sex with him."as an indirect reference to the fact that Thomas *26 was the only one who could tell what happened, viewed in the context of the evidence presented in the case and the entire proceeding, this comment did not constitute plain error. Cf. Ex parte Clark, 728 So.2d at 1129, 1131 (in the context of the evidence and the entire closing arguments, the prosecutor did not commit plain error by commenting that the defendant did not tell the truth in his extrajudicial statement and "There was no testimony, it was a statement we offered.").
In so holding, we reject Thomas's argument that the prosecutor's comments here are as condemnable as those in Powell v. State, 631 So.2d 289 (Ala.Cr.App. 1993), another death-penalty case. There, the prosecutor stated, in closing argument, that there were two people involved in the crime: the deceased victim, who could not "come in and testify," and the defendant. Id. at 290. The prosecutor continued, "There are no eyewitnesses to this crime.... So what do you have to look at if you don't have eyewitness testimony? You have got to go on circumstantial evidence." Id. The court held that these comments were plain error and that they adversely affected the appellant's substantial right not to be compelled to give evidence against himself, citing Ala. Const. Art. I, § 6. The court noted that, with these last comments, "the prosecutor called the jury's attention to the fact that the appellant, the only eyewitness who could have taken the stand, did not testify." Id. at 291-92 (emphasis in original). We reiterate that we look at the impact of an allegedly improper comment in the context of the entire proceeding, and that we do not view the comment in the abstract. McWhorter v. State, 781 So.2d 257 (Ala.Cr. App.1999). We find that the circumstances of the case before usnot the circumstances presented in Powelldictate a finding of no plain error.
B.
"[T]he reason I tell you that[, but for the forensic experts' evidence, the victim's husband would still be the prime suspect] is because as a prosecutor what you attempt to do is anticipate defenses. And in this case, the State believes you might hear evidence thatfrom the Defense that [Thomas and the victim] knew each other. And understand the Defendant doesn't have to testify. He has to present no evidence. But through certain forms of testimony you might hear them try and assert that he knew her and that sex was consensual and that maybe [T.L.] came home and found her with Billy and maybe [T.L.] killed her."
(R. 152) (emphasis added by Thomas). Thomas more specifically asserts that the specific statement"And understand the Defendant doesn't have to testify."is a direct comment on his failure to testify and that the prosecutor's additional comments only exacerbated the error caused by this specific statement. He further points out, "Where there has been a direct comment on, or direct reference to, a defendant's failure to testify and the trial court does not act promptly to cure the comment, the defendant's conviction must be reversed." Ex parte Purser, 607 So.2d at 304 (citing Ex parte Wilson, 571 So.2d 1251 (Ala. 1990)). (In both Purser and Wilson, the issue of improper comments had been objected to in the trial court.)
We begin our analysis of this argument with Bailey v. State, 717 So.2d 3 (Ala.Cr. App.1997). There, the court held that the following closing remarks by the prosecutor was a comment on Bailey's failure to testify: "And, I'm not talking about him testifying, he didn't have to. It is his constitutional right that he does not have to testify.... He could have cleared all *27 this up, though." Id. at 4 (emphasis added). The court further held that the trial court did not cure the prejudicial effect of the prosecutor's argument by denying Bailey's motion for mistrial; instructing the jury, "[D]isregard the last statement of the assistant district attorney. The defendant has the constitutional right to remain silent as I will instruct you when we get to the Court's charge of the law.", id.; and instructing, in its oral charge, that the defendant has a constitutional right to remain silent and that he is presumed innocent until proven guilty beyond a reasonable doubt. In reversing the trial court, this court stated the following:
"The trial court's curative instructions did not fulfill the minimum requirements for such instructions. The court merely instructed the jury to disregard the prosecutor's comment and instructed jurors that the appellant had the right to remain silent. The court failed to go any further. Particularly detrimental to the appellant was the court's failure to instruct jurors that no presumption of guilt or inference of any kind should be drawn from the appellant's failure to testify. See Ex parte Wilson, 571 So.2d at 1265."
717 So.2d at 5-6.
Here, the trial court did not instruct the jury at any time that it could not draw any inference from Thomas's failure to testify. However, in our review for plain error, we find critical distinctions between this case and Bailey. First, the circumstances here, including defense counsel's failure to object, indicate that the prosecutor did not manifestly intend his argument to be a comment on Thomas's failure to testify. In fact, the record offers affirmative proof that even defense counsel did not construe the comment to be a prohibited comment under the facts of this case: the jury had in effect already been advised that the defendant does not have to testifyby both the trial court and defense counsel. After instructing the jury venire during voir dire on the presumption of innocence, on the fact that that presumption attended Thomas as a "matter of evidence" throughout the trial, and on the prosecution's burden of proof beyond a reasonable doubt, the trial court stated:
"There is no duty or responsibility or obligation on a Defendant in a criminal proceeding to present any evidence or give any testimony. Do any of you have any problems with those concepts of our laws: First, the presumption of innocence; second, the burden of proof beyond a reasonable doubt being on the State of Alabama; and last, there being no obligation or responsibility on a Defendant to present any evidence or give any testimony? Anybody got any problems with those concepts of our laws? "(No audible response.)"
(R. 41) (emphasis added). Moreover, defense counsel, during voir dire of venire, stated:
"Now, what we lawyers say the Judge will tell you at some point is not evidence. The evidence that you'll use to make your decision will come from the witness stand, the testimony from the witnesses or exhibits that are introduced.
"Now, the Judge will tell you that the burden of proof in this case, as [the prosecutor] told you, never shifts. It doesn't[Thomas] doesn't have to produce anything. He doesn't have to produce any witness, no exhibits. He doesn't have to testify himself. Anybody think that's a bad system?
"(No audible response.)
"[Defense counsel]: There was a crime committed here, and we're all here and he should have to testify?

"(No audible response.)"
*28 (R. 75) (emphasis added). Defense counsel also relied, in his closing argument, upon the comment he now asserts is a direct comment on Thomas's failure to testify. He stated, in closing, the following:
"Now, I also told you at the beginning... that [Thomas] doesn't have any burden of proof, doesn't have to produce any evidence, doesn't have to testify himself, produce any exhibits. He demands the State prove his guilt beyond a reasonable doubt and to a moral certainty before you can find him guilty.... And I asked you in voir dire examination when we were talking to the whole panel, I asked you if anyone was going to make [Thomas] prove his innocence.... Are you going to make him prove his innocence, and by your silence you suggested to me that you wouldn't."
(R. 398-99) (emphasis added). Thus, those who served on the jury were reminded five times by defense counsel or the trial courtfour before the contested comment by the prosecutor that is under scrutiny that the defendant did not have to testify, and they indicated three times, by their silence, that they had no adverse reaction to that legal principle.
We are required, under our plain-error review of a comment alleged to be on the defendant's failure to testify, to look at the comment's impact in the context of the entire proceeding, and not view it in the abstract. McWhorter v. State, supra. Under the circumstances here, any impact the prosecutor's remark might have had was greatly diminished by defense counsel's comments. Cf. Lockett v. Ohio, 438 U.S. 586, 595, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (when viewed against the background that defense counsel had clearly focused the jury's attention on the defendant's silence, by outlining her contemplated defense in his opening statement and by stating to the jury that the defendant would be the "next witness," the prosecutor's repeated remarks that the evidence was uncontradicted "added nothing to the impression that had already been created by [the defendant's] refusal to testify after the jury had been promised a defense by her lawyer and told that [the defendant] would take the stand") (emphasis added). We need not speculate, however, on the degree of impact of the prosecutor's comment here. The record presents a concrete indication: the veniremembers' silence on voir dire indicates that the jury would have had no adverse reaction to the comment.
In considering the comments by defense counsel during voir dire, we have considered the following:
"The state here argues that appellant's counsel by inquiring of the jury panel on voir dire as to whether a member of the panel would hold it against appellant if he chose to exercise the right not to testify, or if thereby a member would think that he was holding something back, or if a member would follow an instruction on that subject, waived the right to have no comment thereafter on his failure to testify. Apparently, the state's argument is that appellant initially opened up the subject himself. It seems clear that appellant was entitled to have selected a fair and impartial jury, and therefore would be entitled to inquire at that point, on voir dire, whether any panel member would be prejudiced by appellant's failure to testify, or whether they would follow an instruction of the court on the subject. To have empaneled a fair and impartial jury was appellant's first right, or conjunctively to that was his right to have no adverse presumption or inference drawn by the jury by his failure to testify. He was entitled to both rights so as *29 to reduce a possible jury reaction to lessen the state's burden to prove his guilt beyond a reasonable doubt because of his failure to testify. There was no waiver of comment upon appellant's failure to testify by reason of his voir dire examination."
State v. Cokes, 682 S.W.2d 59, 61-62 (Mo. Ct.App.1984) (reversing on the prosecutor's unobjectedto comment, "[The victim is] the only one that could take the stand and tell you what happened...." and the objectedto comment, "The defendant has the right not to testify.") We acknowledge that the defendant's right to a thorough voir dire is of great importance. We agree that any questioning of the jury venire on a defendant's Fifth Amendment right does not waive or excuse any subsequent comment by the prosecutor regarding that right. However, here, we are reviewing the impact of the prosecutor's argument in the context of the entire proceeding to determine whether the prosecutor's argument constitutes plain error. The entire proceeding includes the voir dire of the jury venire, which, in this case, occurred very close in time to the argument under review. See, e.g., Butler v. Rose, 686 F.2d 1163, 1171 & n. 9 (6th Cir.1982) (the court's "probing analysis of the context of the [prosecutor's] comment" included consideration of defense counsel's comments during voir dire of the jury venire).
We conclude that the prosecutor's comments, on their face, did not suggest to the jury that it should draw an adverse inference from Thomas's failure to testify, as did the prosecutor in Bailey. (The prosecutor in Bailey, followed his comment that Bailey had a constitutional right not to testify, with the comment "He could have cleared all this up, though.") Cf. United States v. Passaro, 624 F.2d 938, 945 (9th Cir.1980) (one factor in determining whether a comment on a defendant's failure to testify is harmless error is that "there was no attempt to link a conclusion of guilt with defendant's silence"), cert. denied, 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 842 (1981). See, e.g., Moore v. State, 669 N.E.2d 733, 739 (Ind.1996) (prosecutor's statement"[the defendant] didn't choose to testify"was not an improper comment because it could not have been interpreted as a suggestion to infer guilt from the defendant's silence). We find that the jurors would not have naturally and necessarily considered the prosecutor's argument to be a comment on Thomas's failure to testify. See Butler v. Rose, 686 F.2d at 1173 n. 9 (6th Cir.1982) (defense counsel's focusing the jury on a defendant's silence is a factor in determining whether a jury naturally and necessarily would view a prosecutor's later statements to be an impermissible comment on the defendant's failure to testify).
We have not interpreted the pertinent cases decided by the Alabama Supreme Court as compelling a rule that such a comment"And understand the Defendant doesn't have to testify."is per se reversible, without regard to the prosecutor's intent or to the jury's impression of the comment. See Baxter v. State, 723 So.2d 810, 816 (Ala.Cr.App.1998) (also stating, "`The U.S. Supreme Court ... has declined to give Griffin an absolutist reading and has rejected the argument that all "direct" references are improper. United States v. Robinson, 485 U.S. 25, 31-32[, 108 S.Ct. 864, 99 L.Ed.2d 23] (1988).") (quoting Moore v. State, 669 N.E.2d 733, 739 (Ind.1996)). See also Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (the Court affirmatively rejected the position that any prosecutorial reference per se requires reversal).[6] *30 Cf. United States v. Hasting, 461 U.S. 499, 505, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (in reviewing a prosecutorial comment of a defendant's failure to testify in a federal prosecution, the Court held that "the harmless error rule of Chapman ... may not be avoided by an assertion of supervisory power, simply to justify a reversal"). Thus, we conclude that the Alabama courts have not applied a more stringent standard than the Supreme Court has held that the Federal Constitution requires. See S.R. Shapiro, Annotation, Violation of Federal Constitutional Rule (Griffin v. California) Prohibiting Adverse Comment by Prosecutor or Court upon Accused's Failure to Testify, as Constituting Reversible or Harmless Error, 24 A.L.R.3d 1093, 1101 (1969) ("Although establishing this minimal standard, the Chapman Case did not, however, purport to prevent any jurisdictions, independently of federal constitutional requirements, from imposing even stricter standards or from holding that an improper comment on a defendant's failure to testify is always prejudicial per se and a ground for automatic reversal of the defendant's conviction.").
Similar comments to the one made here have been upheld against the argument that they constituted comments on the defendant's failure to testify. See, e.g, United States v. White, 444 F.2d 1274, 1277-78 (5th Cir.) (in explaining in closing argument that the defense had the right to rebut the presumption raised by evidence of possession of recently stolen property, the prosecutor stated that the defendant was not bound to take the stand; the court held that this comment was not manifestly intended or was not of such character that the jury would naturally and necessarily take it to be a comment on the failure of the defendant to testify), cert. denied, 404 U.S. 949, 92 S.Ct. 300, 30 L.Ed.2d 266 (1971); People v. Moore, 109 Ill.App.3d 874, 441 N.E.2d 409, 412, 65 Ill.Dec. 496 (1982) (the following closing comment was not calculated to draw the jurors' attention to the defendant's exercise of his right not to testify: "[O]n the defendant's case you will be instructed that the fact that the defendant did not testify should not be considered by you in any way in arriving at your verdict."). Moreover, some courts have relied on such a statement to uphold another prosecutorial comment, as not constituting a comment on the defendant's failure to testify. See, e.g., United States v. Bond, 22 F.3d 662, 669 (6th Cir.1994) (in determining that the prosecutor's argument was not a comment on the defendant's failure to testify, the court considered as an ameliorating factor that "the prosecutor himself during closing commented on the fact the defense is under no obligation to testify or offer evidence"); United States v. Watson, 866 F.2d 381, 386 (11th Cir.1989) (in determining that the prosecutor's objectedto remarks were not a comment on the defendant's failure to testify, the court noted that "the prosecutor's preface of her remarks with the admonishment to the jury that Watson had no duty to testify ... tend[ed] to negate *31 any possibility that the jury would misinterpret the prosecutor's comments").
Rather than suggesting that the jury infer guilt from Thomas's failure to testify, we believe the prosecutor was attempting to state an anticipated defense. Although we consider this strategy to be highly reckless and inappropriate, we do not find that the prosecutor committed plain error in this case. The substance of the prosecutor's remarks here is more akin to that of the comments reviewed in Griffin v. State, 790 So.2d 267 (Ala.Cr.App.1999). The court in Griffin reviewed for plain error the following comments by the prosecutor in closing argument: "[a]nd the real issue in this case, as I see the evidence presented, is he's trying to say through his attorneys and through his witnesses that it was somebody else that did this murder, but it wasn't him." Id. at 284. In finding "no error, plain or otherwise," the court explained:
"The alleged improper comment made by the prosecutor, when read in conjunction with the testimony at trial, is simply a restatement of Griffin's defense [of alibi]. We conclude that the prosecutor's statement `"rather than emphasizing the defendant's silence, merely point[s] out his defense and inferentially called on the jury not to believe it."' Kimble v. State, 545 So.2d 228, 230 (Ala. Cr.App.1989), quoting Brinks v. State, 500 So.2d 1311, 1315 (Ala.Cr.App.1986)."
Id. at 285. In Brinks, after telling the jury in closing argument that the defense's "smoke screens" were not effective because the evidence from the witness stand was insurmountable, the prosecutor stated, "[The defendant] who wants to tell you that he wasn't there was in." 500 So.2d at 1314. In finding this comment to be permissible, the court stated:
"In our judgment, the statement ... was not manifestly intended to be a reference to the defendant's silence. Rather than focusing on the defendant's failure to come up with a defense, the comment drew the jury's attention to the defense's theory of the case.
". . . .
"... Thus, the quoted portion of the prosecution's closing argument did nothing more than to state for the jury the defense theory of the case. In contrast to the legion of cases commenting on the defendant's failure to rebut the State's evidence, we believe that this statement, rather than emphasizing the defendant's silence, merely pointed out his defense and inferentially called on the jury not to believe it."
Id. at 1314-15.
In noting this caselaw, we are not willing to unequivocally hold that the comment "And understand the Defendant doesn't have to testify."is proper. We emphasize that we in no way are indicating that such a comment would be condoned under other circumstances. In another context, such a statement, although nothing more than a restatement of a defendant's constitutional right, is likely to assume quite a different dimensionone that very well might result in prejudice to the defendant.
However, here, we are being called upon to determine if such a comment, as well as the ancillary comments highlighted by Thomas, constituted plain error. Considering the comments in the context of the entire proceeding, we find that Thomas has not met his burden of establishing that any error affected his substantial rights, i.e., that any error was prejudicial. See "Plain-Error Standard of Review," supra. We are particularly persuaded by the following specific factors: the lack of a contemporaneous objection, which leads us to believe that the argument was more innocuous than not because *32 even defense counsel did not take note; defense counsel's focusing the jury's attention on a defendant's right not to testify; the jurors' indication, during voir dire, that they had no adverse reaction to that right; the fact that the prosecutor's comment did not suggest that the defendant's failure to exercise that right was substantive evidence of guilt; the fact that the context of the comments was the prosecutor's anticipation of the defense theory; the deference due the lack of response by the trial court who was present to hear the prosecutor's tone and manner in making the contested comments; and the overwhelming nature of the evidence of Thomas's guilt. Cf. Baxter v. State, 723 So.2d at 815-18 (among the factors for evaluating a direct comment on a defendant's failure to testify for harmless error are: the conduct complained of, viewed in the context of the facts and circumstances of the case; the intent of the prosecutor making the improper comment; the relative strength or weakness of the case; and whether the remarks were lengthy and repeated or single and isolated). We further note the analysis in Ex parte Land, 678 So.2d at 233, where the Alabama Supreme Court reviewed, under the plain-error standard, the prosecutor's comment, "Through his attorneys [the defendant] continues to say `I don't know anything about....'" In finding no plain error, the court stated:
"We disapprove of a statement by a prosecutor referring the jury to the fact that the defendant spoke through his attorneys, i.e., that he did not speak for himself. Thus, if Land's counsel had made a contemporaneous objection to this statement, and we were to apply the Beecher standard explained above, we might have held the comment to be reversible error. This is true even though it is clear to this Court that, when viewed in the context of the confrontational nature of closing arguments, the prosecutor's comment was intended as a `reply in kind' to the argument made by Land's counsel.
"However, the comment was not objected to during trial. Thus, the statement may be considered only by the standard of the plain error rule. Under that standard, given the evidence presented in this case, we find no plain error in the prosecutor's statement."
678 So.2d at 233 (emphasis added). Cf. People v. Moore, 65 Ill.Dec. 496, 441 N.E.2d at 412 ("In our opinion and given the overwhelming nature of the evidence against the defendant, the prosecutor's remark, while certainly not condonable in any context, constituted harmless error.").
In denying Thomas relief on this issue, we would be remiss if we did not explicitly reject the attorney general's argument that the prosecutor's remark that the defendant does not have to testify was a proper argument because it was a correct statement of the law. It is to be left to the trial court to instruct the jury on a defendant's right not to testify.
In conclusion, in regard to both sets of prosecutorial comments alleged to improperly comment on Thomas's failure to testify, we find that neither set "so infected the trial with unfairness as to make the resulting conviction a denial of due process," Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).
We strongly caution that "[a] prosecutor must be extremely careful not to overstep the mark or to break with the established protocol regarding statements about [the privilege against self-incrimination]." Windsor v. State, 683 So.2d at 1024. While we have concluded that the law and the circumstances of this particular *33 case do not support a finding of plain error, we have not so arrived at that conclusion without wrestling with misgivings. We want to make clear that we do not condone or approve of any comment on a defendant's failure to testify. We remind every prosecutor of his or her constitutionally imposed duty to protect every individual's privilege against incrimination. This case, as well as many cited here, points to the hazard of reversal occasioned by the prosecutor's making any reference to a defendant's failure to testify.

III.
Thomas contends that the trial court erred in failing sua sponte to instruct the jury on the degree of proof necessary for a conviction based solely on circumstantial evidence, i.e., an instruction "that Thomas could not be convicted unless the circumstances were not only consistent with his guilt, but inconsistent with every other reasonable hypothesis, and that no matter how strong the circumstances, Thomas could not be convicted if they could be reasonably reconciled with the theory that Thomas was innocent" or an instruction that "the evidence must be so strong and cogent as to establish Thomas's guilt to a moral certainty, and that it must exclude any inference consistent with Thomas's innocence." (Appellant's Brief, p. 41.) In his argument, Thomas refers to Instruction III-E-4, Alabama Pattern Jury Instructions Criminal (ABICLE 1980). However, the pattern jury instructions in use at the time of Thomas's trial, the third edition published in 1994, do not contain an instruction on the jury's consideration of circumstantial evidence. (Neither does the 1989 revision.)
We review this issue for plain error only. Defense counsel did not request any instruction regarding circumstantial evidence, either orally or in writing. After the trial court's oral charge to the jury, defense counsel stated that he had no objection.
The rule in Alabama is that the standard-of-proof instruction specifically regarding circumstantial evidence is required if the evidence is wholly circumstantial, but not if the evidence consists of both direct and circumstantial evidence. In Howard v. State, 108 Ala. 571, 18 So. 813 (1895), the Alabama Supreme Court held that the trial court committed reversible error in refusing to give the charge, "The jury must find the defendant not guilty if the conduct of said defendant upon a reasonable hypothesis is consistent with innocence." Id. at 573, 18 So. at 814. In so holding, the court stated:
"In every criminal case, the burden rests upon the prosecution to show beyond a reasonable doubt, and to the exclusion of every other reasonable hypothesis, every fact or circumstance necessary to fix the guilt of the accused. In the present case, if the conduct of the accused, i.e. his acts as developed in the evidence, was explainable upon a reasonable hypothesis consistent with his innocence, there was reasonable doubt of his guilt, entitling him to an acquittal. Jones v. State, 90 Ala. 629[, 8 So. 383 (1890) ]."
108 Ala. at 577, 18 So. at 816. The court in Davenport v. City of Birmingham, 570 So.2d 1298 (Ala.Cr.App.1990), followed Howard, in holding that, although the trial court instructed on the concept of circumstantial evidence, it erred in denying the defendant's request that the jury be instructed on the degree of proof necessary to sustain a conviction based on circumstantial evidence. In so ruling, the court quoted the following from Ex parte Williams, 468 So.2d 99, 101 (Ala.1985):
"`An abundance of decisions exists on the extent to which circumstantial evidence *34 may support a finding of guilt, and the general legal requirement has been repeated frequently, although not always in the same terms. These requirements have preserved the force of circumstantial evidence to support a finding of guilt if "the evidence is so strong and cogent as to show defendant's guilt to a moral certainty," ... and the circumstances producing the moral certainty of the accused's guilt "are incapable of explanation on any reasonable hypothesis."'"
(Citations omitted.) See, e.g., Roy v. State, 375 So.2d 1289, 1291 (Ala.Cr.App. 1979) (in a wholly circumstantial evidence case, conviction reversed because the trial court refused a requested charge that "for circumstantial evidence to be sufficient to justify a jury in convicting upon it, the circumstances proved must not only be consistent with the hypothesis that the accused is guilty, but inconsistent with the hypothesis that he is innocent, and inconsistent with every other rational hypothesis except that of his guilt"). See also Ephraim v. State, 627 So.2d 1102, 1106 (Ala.Cr.App.1993) (in addition to reversing the conviction and death sentence on another ground, the court noted, without discussion, and the attorney general "candidly admitted," that the trial court's instructions on circumstantial evidence were flawed because the court did not instruct on the degree of proof necessary to sustain a conviction based on circumstantial evidence). Compare Paul v. State, 48 Ala.App. 396, 401, 265 So.2d 180, 185, cert. denied, 288 Ala. 747, 265 So.2d 185 (1972) (where evidence was both direct and circumstantial, requested instructions on circumstantial evidence were properly refused because they would have tended to mislead the jury by placing undue emphasis upon circumstantial evidence).
The threshold question is whether the evidence against Thomas is entirely circumstantial or consists of circumstantial as well as direct evidence. Thomas argues as follows:
"The State's evidence ... was entirely circumstantial, consisting of the following: (1) Thomas's presence under suspicious circumstances at the scene of the murder, during the approximate time frame when the murder occurred; (2) the semen found in [the victim's] vagina contained Thomas's DNA; (3) Thomas's fingerprints were found on broken glass from the window of the [victim's] apartment; and (4) on the night of the murder, Thomas was seen in possession of property substantially similar to that stolen from the Lamb residence."
(Appellant's Brief, pp. 39-40.) The attorney general, without citing any supporting authority, responds that Thomas's argument "completely ignores the very direct evidence presented by the State, such as DNA matching, DNA population statistics, and fingerprint evidence." (Attorney General's brief, p. 34.)
Contrary to the attorney general's assertion, fingerprint evidence is considered circumstantial evidence. See, e.g., Howell v. State, 627 So.2d 1134, 1142 (Ala. Cr.App.1993); Duncan v. State, 575 So.2d 1198, 1201 (Ala.Cr.App.1990), cert. denied, 575 So.2d 1208 (Ala.1991); Handley v. State, 515 So.2d 121, 123-24 (Ala.Cr.App. 1987); Nichols v. State, 462 So.2d 992, 994 (Ala.Cr.App.1984) ("Although it is recognized that fingerprint ... evidence is circumstantial or opinion in nature[, i]t is the strongest kind of evidence."); Lark v. State, 348 So.2d 539, 540 (Ala.Cr.App. 1977).
In a limited search of caselaw on the question of the nature of DNA evidence, we have found more cases that refer to DNA evidence as circumstantial than as direct. For cases characterizing DNA evidence *35 as circumstantial, see, for example, People v. Groves, 854 P.2d 1310, 1315 (Colo.App.1992); Greenway v. State, 207 Ga.App. 511, 428 S.E.2d 415, 416 (1993); People v. Stremmel, 258 Ill.App.3d 93, 630 N.E.2d 1301, 1307, 197 Ill.Dec. 177 (1994); State v. Spaeth, 552 N.W.2d 187, 192-93 (Minn.1996); Parker v. State, 606 So.2d 1132, 1140-41 (Miss.1992). See also 1 Edward J. Imwinkelried et al., Courtroom Criminal Evidence § 308 (3d ed.1998) (noting that "many types of circumstantial evidence such as DNA tests are highly reliable"). See State v. Moseley, 338 N.C. 1, 449 S.E.2d 412, 433 (1994), cert. denied, 514 U.S. 1091, 115 S.Ct. 1815, 131 L.Ed.2d 738 (1995), for a case reference to a DNA match as direct evidence.
Because there is some, albeit little, legal authority for the conclusion that DNA evidence is "noncircumstantial" or "direct" evidence, there is some validity to the position that any error in not instructing the jury on the "reasonable-hypothesis-of-innocence" instruction is not "plain," i.e., not "clear" or "obvious" under the law. Therefore, the plain error test of Olano is not satisfied.
Assuming, however, that DNA evidence is circumstantial, we find, under our plain-error review, merit in a "narrow" exception to the requirement of a circumstantial-evidence charge, to be given in a wholly circumstantial evidence case, that was recognized in Chapin v. State, 167 Tex. Crim. 390, 320 S.W.2d 341 (1958). The court in Chapin held that, when the facts, though they be circumstances, stand in such relationship one to another that the only logical conclusion to be drawn therefrom is that the accused committed the crime, then failure to charge on the law of circumstantial evidence does not constitute reversible error. Known as "the close juxtaposition rule," it "basically dispenses with the necessity for a circumstantial evidence instruction where the facts proven are so closely related to the main fact essential to guilt so as to be the equivalent of direct testimony." Frazier v. State, 576 S.W.2d 617, 619 (Tex.Cr.App.1978).
"`There is a difference between facts being in such a juxtaposition to warrant an inference of guilt and facts being in such a juxtaposition as to be equivalent to direct testimony. The former, no matter how strong they are or how certain is the guilt of the accused, cannot justify a failure to charge on circumstantial evidence. The latter set of facts will occur only where the evidence is such that it is logically and practically the virtual same thing as direct evidence of the factum probandum.'"
Id. at 620 (quoting Riggins v. State, 468 S.W.2d 841, 846 (Tex.Cr.App.1971) (Roberts, J., dissenting)).
We find that "the circumstantially demonstrated facts [of this case] are in such close relationship to the main facts to be proved so as to be the functional equivalent of direct testimony, [and, thus,] an instruction on circumstantial evidence will be deemed superfluous." Martinez v. State, 635 S.W.2d 629, 633 (Tex.App.1982). The evidence, particularly the fingerprint and DNA evidence juxtaposed with the other circumstantial evidence presented, is such that it is logically and practically the same thing as direct evidence. Thus, the Olano requirement that the error, assuming there is any, be "plain" is not met.[7]
*36 Moreover, we find that the development of this particular rule of lawa mandatory "reasonable-hypothesis-of-innocence" instruction in a wholly circumstantial evidence casecounterattacks any argument that Thomas's substantial rights were affected (the third prong of Olano). In an apparent trend, a number of jurisdictions no longer require a special circumstantial-evidence instruction where other instructions are sufficient:
"[A] few courts have held that general instructions, such as those dealing with the burden of proof, are sufficient, a larger number of jurisdictions have adopted the rule that an instruction on the law of circumstantial evidence is not required where the jury is properly and adequately charged concerning the reasonable doubt standard."
Caroll J. Miller, Annotation, Modern Status of Rule Regarding Necessity of Instruction on Circumstantial Evidence in Criminal TrialState Cases, 36 A.L.R.4th 1046, 1052 (1985)(internal cross-references omitted).
In Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954), the United States Supreme Court abolished the requirement that federal courts instruct that where the prosecution's evidence is circumstantial, it must be such as to exclude every reasonable hypothesis other than that of guilt. The Court stated that "the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect." Id. at 139-40, 75 S.Ct. 127. It reasoned:
"Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."
Id. at 140, 75 S.Ct. 127. Thus, the Court rejected the basis of the circumstantial evidence instruction: "the notion that circumstantial evidence was of a lesser quality than direct evidencethat it was inherently less persuasive and that the jury should be so informed." Hebron v. State, 92 Md.App. 508, 608 A.2d 1291, 1294 (1992), aff'd, 331 Md. 219, 627 A.2d 1029 (1993).
Holland "caused many, if not most, of the States to reexamine the instruction and to eliminate or sharply curtail its use." Id. (However, not Alabama, although we do recognize generally that circumstantial and direct evidence are of the same quality. See, e.g., Lockhart v. State, 715 So.2d 895, 899 (Ala.Cr.App.1997).) Since Holland, it is only "[i]n a few jurisdictions [that] the trial judge must give special cautionary instructions, and the appellate court uses a more stringent standard of review when the prosecution relies wholly or primarily upon circumstantial evidence." 1 Imwinkelried, supra at § 307.
"In the overwhelming majority of jurisdictions, however, the courts do not recognize any formal distinction between direct and circumstantial evidence.... Many jurisdictions employ the popular jury instruction that `[b]oth direct and circumstantial evidence are acceptable as a means of proof. Neither is entitled to any greater weight than the other.' *37 Most federal circuits have explicitly rejected the proposition that a special standard of review must be used to assess the legal sufficiency of the evidence in circumstantial evidence cases."
Id. (footnotes omitted). See also Hankins v. State, 646 S.W.2d 191, 197-98 (Tex.Cr. App.1981) (after noting that at least 22 states and most federal circuits (as of 1983) have abolished the use of the circumstantial evidence charge where the jury is properly instructed on reasonable doubt, the court held that there is but one standard of proofthat the prosecution establish all elements beyond a reasonable doubtand where the jury is properly instructed on that standard, a charge on circumstantial evidence is valueless and invites confusion), and authorities cited therein. Cf. Geesa v. State, 820 S.W.2d 154, 160-61 n. 9 (Tex.Cr.App.1991) (the "reasonable-hypothesis-of-innocence analytical construct" has been rejected, not only in Holland and Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), but also as an appellate method of analysis in all federal jurisdictions and 24 states).
A common rationale for this trend is that circumstantial evidence may have equal, if not greater, weight than direct evidence, and a circumstantial evidence charge, by its suggestion that circumstantial evidence is subject to a more rigorous standard than direct testimonial evidence, disregards this principle. Hankins, 646 S.W.2d at 198. See, e.g., State v. Harvill, 106 Ariz. 386, 476 P.2d 841, 846 (1970). As Professor Wigmore persuasively said:
"`It can be said that there are no rules, in our system of evidence, prescribing for the jury the precise effect of any general or special class of evidence. So far as logic and psychology assist us, their conclusions show that it is out of the question to make a general assertion ascribing greater weight to one class as to the other. The probative effect of one or more pieces of either sort of evidence depends upon considerations too complex. Science can only point out that each class has its special dangers and its special advantages.'"
1 Wigmore on Evidence, § 26, p. 401 (3d ed.1940), quoted in Hankins, 646 S.W.2d at 198-99. In addition, "[r]ather than aiding jurors in applying the reasonable doubt standard, an additional charge on circumstantial evidence focusing on the `reasonable hypothesis' theory serves only to distract jurors from examining the proper standard of proof as the primary focus of their deliberations." Hankins, 646 S.W.2d at 199. Moreover, the additional charge "is inherently confusing to a jury by suggesting that a different burden of proof than the reasonable doubt standard applies in circumstantial evidence cases." Id. at 199 n. 1.
Of course, Alabama is free to remain among the few jurisdictions that have set a higher standard than is constitutionally required.[8] We could not recognize the trend but for the fact that, here, we are looking for plain error. In that context, however, the modern trend offers persuasive argument that Thomas has failed to fulfill the plain error requirement that his substantial *38 rights be affected. Here, any error, if any did occur, did not have an unfair prejudicial impact on the jury's deliberation. The jurors received other instructions the burden-of-proof and the reasonable doubt instructionsthat adequately assisted them in their evaluation of the evidence.[9]See Holland; People v. Edmondson, 106 Ill.App.3d 716, 435 N.E.2d 870, 874, 62 Ill.Dec. 72 (1982) (instruction that the jury should not find the defendant guilty unless the evidence excludes every reasonable theory of innocence is essentially a restatement that the defendant must be proved guilty beyond a reasonable doubt; thus where the jury is properly instructed on the prosecution's burden of proving guilt beyond a reasonable doubt, failure to give circumstantial evidence instruction is not reversible error); State v. Wilkins, 215 Kan. 145, 523 P.2d 728, 736-37 (1974) (same).
This case is neither close nor doubtful; Thomas's guilt was clearly and convincingly established by compelling and overwhelming evidence. Taken as a whole, the evidence did not support any reasonable hypothesis consistent with his innocence; the evidence presented no other reasonable hypothesis that could account for the circumstances presented here. Although he did attempt to explain the damning circumstances pointing solely to his guilt, "[a]n hypothesis which is at best merely possible cannot be equated to a reasonable hypothesis." Stoker v. State, 177 Ga.App. 94, 338 S.E.2d 525, 527 (1985) (the trial court's failure sua sponte to instruct on circumstantial evidence was not reversible because the evidence failed to present any reasonable hypothesis except that of the defendant's guilt). See also Hawes v. State, 240 Ga. 327, 240 S.E.2d 833, 837 (1977) (in a death-penalty case, where the evidence presented only one reasonable hypothesisthe defendant's guiltand where the jury charge on the prosecution's duty to establish the defendant's guilt beyond a reasonable doubt was "full and fair," the trial court's failure to sua sponte charge on circumstantial evidence was not reversible error). Cf. People v. Olinger, 112 Ill.2d 324, 493 N.E.2d 579, 592, 97 Ill.Dec. 772 (1986) (the trial court's refusal to give the "reasonable-hypothesis-of-innocence" instruction was harmless error where evidence was such that the jury's verdict would not have been any different had the instruction been given), cert. denied, *39 479 U.S. 1101, 107 S.Ct. 1329, 94 L.Ed.2d 180 (1987); People v. Brian, 84 N.Y.2d 887, 644 N.E.2d 1345, 620 N.Y.S.2d 789 (1994) (same); People v. Sumter, 173 A.D.2d 659, 570 N.Y.S.2d 233 (the trial court's refusal to instruct was harmless, where evidence was overwhelming and excluded to a moral certainty every reasonable hypothesis of innocence), appeal dismissed, 78 N.Y.2d 975, 580 N.E.2d 427, 574 N.Y.S.2d 955 (1991); People v. Borazzo, 137 A.D.2d 96, 528 N.Y.S.2d 99, 102 (N.Y.App.Div.1988) (where evidence in murder conviction consisted entirely of circumstantial evidencethe appellant's fingerprints at the crime scene and his possession of property stolen from the crime scenethe trial court's failure to instruct was harmless because "the evidence was of such quality and quantity that it was clearly sufficient to exclude every reasonable hypothesis but guilt"). The evidence and all reasonable deductions therefrom were completely inconsistent with a reasonable hypothesis of innocence. To reverse on a finding of plain error under the facts before us would be a perversion of justice.

IV.
Thomas also contends that the prosecution failed to establish chains of custody for the certain sampleshis blood sample and the vaginal swabs of the victim's bodyupon which the DNA tests were performed and that, as a result, he was denied his rights to due process and to a fair trial.
In regard to Thomas's blood sample (State's Exhibit 27),[10] the prosecution established that Nurse Emerald Gray Howell drew a sample of Thomas's blood into a vial, labeled the vial with Thomas's name and Social Security number, and secured it in a sealed plastic envelope; that Howell gave the sealed envelope to Officer James Stallworth; and that Stallworth gave it to William Jones, a forensic biologist with the Mobile Regional Laboratory of the Alabama Department of Forensic Sciences. All three testified; Thomas does not contest any part of the chain before Jones's possession. He contends rather that the chain breaks with Jones, with no showing of the "links" intervening between the possession by Jones and that by Faron Brewer, the Department's specialist in DNA profiling, and also with no showing of Jones's safeguarding and handling of the sample while in his possession.
Jones specifically testified that he received Thomas's blood sample from Stallworth and that he made a dried stain of this blood. Jones further explained that, after a stain is made immediately upon receipt of a blood sample in liquid form, the following occurs: "The case number and the item number is identified on that stain. And if appropriate, then other information *40 such as reference case numbers and/or names or other identifying numbers are given." (R. 293.) Jones then identified Exhibit 27 as that stain created by him from Thomas's sample. He also testified that it was in the same or similar condition as when he created it. He failed to testify as to what he subsequently did with the dried bloodstain.
Brewer, who testified after Exhibit 27 was received in evidence, did not testify as to whom he received the dried stain of Thomas's blood from. However, he did identify Exhibit 27 as one of the items he performed DNA testing on. Moreover, in generally describing the restriction fragment length polymorphism (hereinafter "RFLP") procedure used to produce DNAmatching evidence, Brewer testified,
"[I]t begins by removing the DNA from these items [the vaginal swabs and bloodstains] through a process called lysis and extraction. [Y]ou ... put the individual samples into individual tubes that are labeled with specific case identifiers, unique numbers that allow us to track the samples all the way through the procedure since there are several steps." (R. 340.)
In regard to the vaginal swabs (State's Exhibit 20), the evidence established that the swabs were collected by Dr. LeRoy Riddick, the director of the Mobile Regional Laboratory for the Alabama Department of Forensic Sciences, who performed an autopsy on the victim's body. Dr. Riddick identified Exhibit 20 as the envelope that contained the vaginal swabs; the envelope had his signature and the date across the back where he had sealed it. When asked, "And is that packaged in the same or substantially the same condition as when you placed the swabs in there?," without objection, Dr. Riddick testified, "[I]t's been opened and resealed by I think it's Faron Brewer. But other than that, I guess it's in the sameI don't see anything else. It hasn't been torn open any other place except for where he's sealed it." (R. 275.) He also testified that he placed the envelope containing the swabs in a locked room and that "[it] was passed on to the people in serology." (R. 276.) Again, Thomas does not contest the chain until Jones's possession. He contends that the prosecution failed to establish Jones's ultimate disposal of the swabs, his safeguarding and handling of them, and Brewer's receipt of them.
Jones testified that he received Exhibit 20 from Dr. Riddick and that he "forwarded" it to Brewer after screening the swabs for the presence of blood and seminal fluid. Brewer identified Exhibit 20 as one of the items on which he performed DNA analysis in this case. Brewer answered affirmatively to the question, "And you also had a vaginal swab that was identified being from [the victim] also?" (R. 341.) Brewer offered no testimony regarding the chain of custody of the swabs.
The dried stain of Thomas's blood (State's Exhibit 27), which Thomas argues "presents the most egregious chain of custody failure" (Appellant's Brief, p. 44), was offered in evidence during Jones's testimony and before Brewer's testimony. When the prosecution offered the bloodstain, defense counsel stated, "No objection." (R. 294.) Thus, when defense counsel affirmatively acknowledged that he had no objection to the admission of Exhibit 27, the prosecution had presented an adequate chain up to Jones's receipt and Thomas so concedes in his brief. Thomas, in brief, contests only that part of Exhibit 27's chain that occurred after Jones's receipt the very part he essentially relieved the prosecution from establishing by his claim of no objection during Jones's testimony.
The prosecution offered the vaginal swabs (State's Exhibit 20) during the testimony *41 of Dr. Riddick, the first "link" in Exhibit 20's chain. When the prosecution offered Exhibit 20, the court asked, "Any objection?"; defense counsel stated, "No objection." (R. 276.) On appeal, Thomas concedes that the chain of Exhibit 20 was adequate through Jones's receipt. Thus, as with Thomas's blood sample, at the time of defense counsel's affirmative acknowledgement that he had no objection to the admission of Exhibit 20, the prosecution had presented an adequate chain. Again, he contests only that part of the chain he essentially relieved the prosecution from proving.
Moreover, we note, in regard to the defense's response to the prosecution's offer of the two exhibits in evidence, that defense counsel asked Jones only two questions on cross-examination, both unrelated to the chains of custody. His cross-examination of Brewer on voir dire consisted of three pages, but he asked no question relevant to the chains of the items tested in the DNA profiling. He asked Brewer no question before the jury. Although a hearing was held, evidently pursuant to Ex parte Perry, 586 So.2d 242 (Ala.1991),[11] the record contains no motion or objection directed at the admission of the DNA-profiling evidence, more particularly none concerning the chains of custody, the condition of the samples, or the manner in which the samples were handled. Not only did counsel not make any pertinent objection, he specifically stated that he had no objection to the introduction of the samples. He made no effort even to hint at any problem with the chains of custody. Moreover, there is nothing in the record to suggest that the samples had been tampered with, altered, or mixed up before the DNA testing was performed. In fact, Thomas does not even allege anything of that nature in his brief. His issue is based on sheer speculation, not on any affirmative showing by the evidence that there were additional "links" that were missing from the prosecution's proof, or that the samples at the time they were tested were in a condition different from that at the start of the chains.
The particulars of this chain-of-custody issue call for a vigilant observance of the "narrowness of the plain-error rule," as Judge Carnes urged in United States v. Pielago, 135 F.3d 703, 709 (11th Cir.1998), in the discussion under the heading "Plain-Error Standard of Review," supra. This issue illustrates the difficulty an appellant has in meeting the stringent requirements of the very limited exception to the contemporaneous objection rule, i.e., plain error. "[T]he doctrine [of plain error] is less likely to be applied where the [alleged] error could have been readily corrected by an objection at trial, or where such an objection may have led the government to introduce additional evidence on the issue." Wayne R. Lafave & Jerold H. Israel, Criminal Procedure § 27.5(d) (2d ed.1992). We have absolutely no indication that the prosecution could not have produced additional evidence regarding the chains, had defense counsel not indicated he had no objection to the admission of the samples. We emphasize the purposes of limiting any exception to the contemporaneous-objection rule: "requiring timely objections allows the trial courts to develop a full record on the issue, consider the matter, and correct any error before substantial judicial resources are wasted on appeal and then in an unnecessary retrial." Pielago, 135 F.3d at 709. We do not find the issue before us presents reason to upset "the rule's careful balancing *42 of the need to encourage all trial participants to seek a fair and accurate trial the first time around against the insistence that obvious injustice be promptly redressed." 5 Am.Jur.2d Appellate Review § 767, p. 437 (1995) (emphasis added).
The presentation of a chain of custody is such a basic tenet in the admission of evidence, it would be incredulous to assume that defense counsel was not aware of the prosecution's responsibility or of his client's right to have evidence sought to be introduced properly authenticated. We can assume only that he intentionally chose to relinquish any insistence that the prosecution present any further authentication. Otherwise, we would be promoting the practice of "sandbagging."
Moreover, we find additional reason to reject Thomas's argument in this regard under Rule 45A. In so finding, we have been mindful of the requirements of a chain of custody, as set forth by the Alabama Supreme Court in Ex parte Holton, 590 So.2d 918, 919-20 (Ala.1991).[12] We have also considered the critical need for a chain of custody, as expressed by the following well-respected authority:

*43 "The use of a chain of custody to authenticate evidence is well established in criminal trials. Nevertheless, two commentators have written that the governing federal rule `can easily be read as doing away with any chain of custody requirement.' This seems doubtful. If anything, there is a need for more stringent requirements. The ... increasing volume of DNA testing heighten[s] the importance of proper handling procedures. Indeed, improper labeling was the cause of an error in a DNA proficiency test.
"In some situations the proponent must establish a chain of custody. Proof of the chain of custody may be necessary either because the item of evidence is not readily identifiable or because more than simple identification is necessary to establish the item's relevance.
"First, a chain of custody is often required for fungible evidence because these items have no unique characteristics. The inability to distinguish between fungible items makes positive identification by observation often impossible. In addition, the nature of these items frequently makes them particularly susceptible to tampering or loss.[40] Nevertheless, the proper handling of fungible evidenceusing locksealed envelopes or containers that custodians then mark and initialmakes the evidence readily identifiable and eliminates most problems of misidentification and contamination.
"Second, if the relevance of an exhibit depends on its subsequent laboratory analysis, identification by police markings made at the scene does not provide a sufficient foundation. The markings establish that the exhibit in court was the item seized by the police, but a chain of custody may be necessary to establish that the item seized was the item analyzed at the crime laboratory. For example, in Robinson v. Commonwealth [, 212 Va. 136, 183 S.E.2d 179 (1971),] the court reversed a rape conviction due to a break in the chain of custody: `The mere fact that the blouse and the panties were identified [by the victim at trial] did not prove the chain of possession necessary to validate the F.B.I. analysis of them.'[44]
"Third, if the condition of the object, not merely its identity, is the relevant issue, a chain of custody may be required to establish that the object had not been altered during police custody. This requirement is a necessary safeguard for evidence that is susceptible to undetected contamination or deterioration, such as blood samples[45].... Contamination problems also arise with DNA evidence. In an early DNA proficiency test, `out of 50 samples, 2 firms each declared 1 false match that could have resulted in the conviction of an innocent person. The errors apparently arose from sample handling problems.' Indeed, in State v. Hammond [, 221 Conn. 264, 604 A.2d 793 (1992),] the prosecutor argued unsuccessfully that exculpatory DNA evidence had been contaminated.
"____________
"[40]The `danger of tampering, loss, or mistake with respect to an exhibit is greatest where the exhibit is small and is one which has physical characteristics fungible in nature and similar in form to substances familiar to people in their daily lives.' Graham v. State, 253 Ind. 525, 531, 255 N.E.2d 652, 655 (1970). See also United States v. Haldeman, 559 F.2d 31, 108 (D.C.Cir.1976) (`There was never any significant risk, as there would be with a fungible piece of real evidence, such as blood samples, that the tape recordings were inadvertently exchanged with other evidence of a similar *44 type'), cert. denied, 431 U.S. 933[, 97 S.Ct. 2641, 53 L.Ed.2d 250] (1977)....
". . . .
"[44] ... See also United States v. Ladd, 885 F.2d 954, 957 (1st Cir.1989) (`In short, there was no competent proof to indicate that the sample extracted from Massey's corpse was the one which CSL tested. An important step in the custodial pavane was omitted.')....
"[45] See Lynch v. State, 687 S.W.2d 76, 78 (Tex.App.1985) (chain of custody required for blood in a criminal case); Ritter v. State, 3 Tenn.Crim.App. 372, 462 S.W.2d 247, 249 (1970) (`Blood specimens... should be handled with the greatest of care and all persons who handle the specimen should be ready to identify it and testify to its custody and unchanged condition')...."
1 Edward J. Imwinkelried et al., Courtroom Criminal Evidence § 503, pp. 134-37 (3d ed.1998) (other footnotes omitted).
In Suttle v. State, 565 So.2d 1197, 1199 (Ala.Cr.App.1990), the court stated:
"With regard to specimens taken from the human body, it is also incumbent upon the prosecution to show that the specimen analyzed was in fact the specimen taken from the defendant. In such cases, `[t]he "chain of custody" involves "the necessity of proving where and by whom the specimen was kept and through whose hands it passed." J. Richardson, Modern Scientific Evidence, Section 13.14a (2d ed.1974).' Gothard v. State, 452 So.2d 889, 890 (Ala.Cr.App.), cert. stricken, 450 So.2d 479 (Ala.1984).... `[W]here the substance analyzed has passed through several hands the evidence must not leave it to conjecture as to who had it and what was done with it between the taking and the analysis.' Rodgers v. Commonwealth, 197 Va. 527, 90 S.E.2d 257, 260 (1955) (emphasis added [in Suttle])."
In specific regard to chain-of-custody requirements for critical DNA evidence, we recognize the following:
"Even the strongest evidence will be worthlessor worse, might possibly lead to a false convictionif the evidence sample did not originate in connection with the crime. Given the great individuating potential of DNA evidence and the relative ease with which it can be mishandled or manipulated by the careless or the unscrupulous, the integrity of the chain of custody is of paramount importance."
National Research Council, The Evaluation of Forensic DNA Evidence 25 (1996) (hereinafter "1996 NRC Report").[13]See also State v. Morel, 676 A.2d 1347, 1356 (R.I.1996) ("[I]n the preservation and testing of DNA evidence, careful attention and proper handling of the crime sample by police and scientists are crucial in defending chain-of-custody issues and in ensuring that laboratory mislabeling and inadvertent contamination have not occurred. Reference Manual on Scientific Evidence, at 293 [(Federal Judicial Center 1994)]."); Sally E. Renskers, Comment, Trial by Certainty: Implications of Genetic "DNA Fingerprints," 39 Em.L.J. 309, 316-17 (1990).
Under the particular facts here, however, we do not find any plain error in regard to the chains of custody of the DNA profiling evidence. The first basis for this conclusion is the fact that Thomas directs his incomplete-chains attack to those "links" that occurred in the chains after both bodily samples were submitted, in sealed envelopes, to the forensic lab. It is upon this fact that we recognize the *45 merit of the following as to the particular facts before us:
"`The principles governing chain of custody challenges were outlined in United States v. Lane, 591 F.2d 961, [962] (D.C.Cir.1979), as follows:
"`"Tangible evidence of crime is admissible when shown to be `in substantially the same condition as when the crime was committed.' And it is to be presumed that the integrity of evidence routinely handled by governmental officials was suitably preserved `[unless the accused makes] a minimal showing of ill will, bad faith, evil motivation, or some evidence of tampering.' If, however, that condition is met, the Government must establish that acceptable precautions were taken to maintain the evidence in its original state.
"`"The undertaking on that score need not rule out every conceivable chance that somehow the identity or character of the evidence underwent change. `[T]he possibility of misidentification and adulteration must be eliminated,' we have said, `not absolutely, but as a matter of reasonable probability.' So long as the court is persuaded that as a matter of normal likelihood the evidence has been adequately safeguarded, the jury should be permitted to consider and assess it in the light of surrounding circumstances."'
"United States v. Roberts, 844 F.2d 537, 549-50 (8th Cir.), cert. denied, 488 U.S. 983[, 109 S.Ct. 534, 102 L.Ed.2d 565] (1988), quoting United States v. Anderson, 654 F.2d 1264, 1267 (8th Cir.), cert. denied, 454 U.S. 1127[, 102 S.Ct. 978, 71 L.Ed.2d 115] (1981)."
Moorman v. State, 574 So.2d 953, 956-57 (Ala.Cr.App.1990) ("[d]espite the facts that two `links' in the chain of custody did not testify and were only generally identified as a [hospital emergency room] unit secretary and a person from the [hospital] laboratory" who "picked up the sample," the court found no break in the chain of custody of the blood sample because "[t]he evidence and the totality of the circumstances in this case establish a reasonable probability of the identity of the blood sample and the integrity of the continuity of possession," id. at 956), quoted with approval in Perkins v. State, 808 So.2d 1041, 1104 (Ala.Cr.App.1999) (no plain error in the procedure for safeguarding evidence used by the Alabama Department of Forensic Sciences lab, specifically allowing the contract driver who delivered evidence to the lab to place items in a secured locker when forensic examiners are unavailable to receive evidence); Whitt v. State, 733 So.2d 463, 473-74 (Ala.Cr.App.1998) (no break in chains of items retrieved at crime scene although the scene was unattended at times); Smith v. State, 677 So.2d 1240, 1246 (Ala.Cr.App.1995) (recognized the law as quoted in Moorman and as applied in a hospital setting). See also Wallace v. State, 574 So.2d 968, 970 (Ala.Cr.App. 1990). Cf. Land v. State, 678 So.2d 201, 212 (Ala.Cr.App.1995) (in a death-penalty case, in response to the appellant's argument that the chains of custody for the victim's pants and blouse were incomplete, after their receipt by the Department of Forensic Sciences, which tested them for semen and blood, the court noted, "Furthermore, the possibility that the evidence was tampered with once it arrived at DFS-Birmingham lab is so remote as to be negligible."), aff'd, 678 So.2d 224 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996).
However, this "presumption of regularity" has been criticized.
"In satisfying its burden of proof, the prosecution is frequently aided by the *46 so-called `presumption of regularity.' As one court has commented [Gallego v. United States, 276 F.2d 914, 917 (9th Cir.1960)]:
"`In the absence of any evidence to the contrary, the trial judge was entitled to assume that this official would not tamper with the sack and can or their contents. Where no evidence indicating otherwise is produced, the presumption of regularity supports the official acts of public officers, and courts presume that they have properly discharged their official duties.'
"Several cases have extended the presumption to hospital personnel. The presumption of regularity, however, has been criticized. `The presumption of regularity, if it can be dignified as a rule, does not serve as a substitute for evidence when authenticity is, as here, challenged on not insubstantial grounds. At best it may relieve the government of the necessity for offering proof of custody until the integrity of the evidence has been put in issue.'[119] In addition, Wigmore observed that the presumption of regularity was `more often mentioned than enforced.' In short, the presumption could be deleted from the cases and nothing would change. The prosecution's burden would remain the same.
"____________
"[119]United States v. Starks, 515 F.2d 112, 122 (3d Cir.1975). See also United States v. Lampson, 627 F.2d 62, 65 (7th Cir.1980) (`The Government's burden ... cannot be diluted by unwarranted presumptions about the evidence it seeks to introduce.'); Bauer v. Veith, 374 Mich. 1, 3, 130 N.W.2d 897, 899 (1964) (presumption cannot be used to `supply missing links in the chain')."
1 Imwinkelried, supra, at § 506, pp. 149-50 (some footnotes omitted).
Under the particular facts before us, where scrutiny of each chain is under the plain-error rule, we see no need to reckon with this criticism. Clearly, neither defense counsel nor any evidence in the record "challenged" the authenticity of the bodily substances, much less "challenged [their authenticity] on not insubstantial grounds." Under the specific circumstances presented here and applying the presumption, we find no plain error in relieving the prosecution of the necessity of offering more specific proof of the chains of custody after the evidence had been received by the forensic lab. Not only was the integrity of the evidence not put in issue, defense counsel specifically stated that he had no objection to the evidence, and he failed to make "a minimal showing of ill will, bad faith, evil motivation, or some evidence of tampering."
Our second basis for refusing to find plain error in the record in regard to the chains of custody of the DNA-profiling evidence, is our recognition that, under the narrow facts of this case, we find no impediment to applying § 12-21-13. This statute provides, in part:
"Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence."
The attorney general asserts that, pursuant to this statute, any failure in the prosecution's chain-of-custody evidence *47 went to the weight, not to the admissibility, of the evidence. In response, Thomas quotes 2 Charles W. Gamble, McElroy's Alabama Evidence § 320.01, pp. 1512-13 (5th ed.1996):
"There is, of course, one limit upon the legislature's power in this area. The legislative branch is without the power to enact a rule of evidence that, when applied, will deprive a litigant of his or her constitutionally guaranteed rights.... It remains to be seen whether constitutional attacks, likely to be mounted against the above chain-ofcustody statute, will be successful. The admission of fungible evidence such as drugs and bodily fluids, admitted without a showing of any chain of custody by which to determine its original identity and unadulterated condition, may well violate due process of law."
In our review of the cases citing § 12-21-13, we have found no Alabama case that has addressed whether the application of § 12-21-13, under particular facts, could violate the defendant's right to due process. The following applied the statute alternatively, as a "moreover," after finding that the evidence was admissible under an adequate chain of custody: Powell v. State, 796 So.2d 404 (Ala.Cr.App.1999); Jackson v. State, [Ms. CR-97-2050, May 28, 1999] ___ So.2d ___ (Ala.Cr.App.1999) (bullet); Loggins v. State, 771 So.2d 1070 (Ala.Cr.App.1999) (boots, clothing, and a piece of paper); Nix v. State, 747 So.2d 351 (Ala.Cr.App.1999) (cocaine); Melson v. State, 775 So.2d 857 (Ala.Cr.App.1999) (tennis shoes). Other cases have merely referred to the statute, for a variety of reasons, without applying it in a holding: Thomas v. State, 766 So.2d 860 (Ala.Cr. App.1998); Whitt v. State, 733 So.2d 463 (Ala.Cr.App.1998); Barnes v. State, 704 So.2d 487 (Ala.Cr.App.1997);[14]Burrell v. State, 689 So.2d 992 (Ala.Cr.App.1996); Bryant v. State, 677 So.2d 834 (Ala.Cr. App.1996); Ellis v. State, 705 So.2d 843 (Ala.Cr.App.1996). Only one case has relied on it solely for the admission of evidence against a claim of an incomplete chain: Bivins v. State, 710 So.2d 521 (Ala. Cr.App.1997) ($72 found in the defendant's pocket).
*48 The critical "links" of the chains identified the specific items of evidence under attack here. Jones testified that once Thomas's blood was in his possession at the forensics lab, he prepared a dried stain, which is stapled to a card with the notations of the forensic lab's case number, the item number, Thomas's full name, and two reference case numbers. Jones identified Exhibit 27 as the stain created by him and testified that it was in the same or similar condition as when he created it. Brewer identified Exhibit 27 as one of the items on which he performed DNA testing. In regard to the vaginal swabs, Jones testified that he received Exhibit 20 from Dr. Riddick and "forwarded" it to Brewer after screening the swabs for presence of blood and seminal fluid. Brewer identified Exhibit 20 as one of the items on which he had performed DNA analysis in this case. Brewer answered affirmatively to the question, "And you also had a vaginal swab that was identified being from [the victim] also?" (R. 341.) "Alabama Department of Forensic Sciences" is printed on the envelope containing the swabs, and handwritten on the envelope are the same case number as that of the dried bloodstain, "swabs vagina," Dr. Riddick's signature, and a date across the seal of the envelope.
Under the narrow circumstances here particularly the fact that the critical "links" identified each exhibit as the one that he collected, handled, or examined and the fact that defense counsel proclaimed that he had no objection to the two exhibitswe see no reason to disregard here the statutory provision that "[w]henever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper." § 12-21-13. Cf. State v. Fels, 741 S.W.2d 855 (Mo.App. 1987) (the prosecution's failure to present the chain between the officer who bought the marijuana and took it to the lab and the criminalist who tested it was not plain error where the officer was able to positively identify the plastic baggie containing the contraband as the one he purchased because, before taking it to the lab, he had marked the baggie with his serial number and initials; he testified that it was "basically the same" as the day he took it to the lab; and the criminalist identified the baggie as the one containing the matter he had tested). Compare Lorne T. Kirby, DNA Fingerprinting 203 (1990):
"Particularly with DNA typing, a proper chain of custody is required because the substances analyzed are not identifiable in a singular sense. Consequently, simple recognition of the container or of the initials on the container holding the substance is insufficient. Mere identification in this sense cannot be submitted for proof that the substance has not been tampered with or that alterations or substitutions have not occurred."
We emphasize, however, that this holding is limited to the facts of this case and should not be used as authority for a finding of constitutionality of the application of § 12-21-13 under circumstances different from those of this case.
In his brief to this court, Thomas relies on Ex parte Cook, 624 So.2d 511 (Ala. 1993). In Cook, the officer who seized the evidence (cigarette butts, a knife scabbard, a bloodsoaked piece of gauze, two bloody socks, and jeans) did not testify and was declared a missing "link." Moreover, the prosecution's evidence failed to establish when the items were sealed or how they were handled or safeguarded from the time they were seized until the forensic serologist received them. The Alabama Supreme Court held that the admission of these items was error under Holton. It *49 further found that the admission of the cigarette butts and socks was prejudicial because the saliva on the cigarette butts seized from the victim's residence matched the blood type of the appellant and the blood type of the blood on the socks seized from the appellant's home was the same as the victim's. It concluded, "The erroneous admission of these items probably injuriously affected [the appellant's] substantial rights, and she is entitled to a new trial. See Rule 45, App.R.App.P." Id. at 514.
We find significant distinctions between the circumstances presented in Cook and those presented here. Foremost, in Cook, the issue was presented by way of objection in the trial court, thus alerting the prosecutor to the fact that the defense contested the chains. No such contest was presented here. Moreover, in Cook, it was undisputed that a critical "link" was missing. Here, the record presents no affirmative evidence of any "link" intervening between Jones's possession of the items and Brewer's possession. We reiterate that Thomas's claim that the bloodstain and the vaginal swabs tested may have been different from those collected is sheer speculation. See Taylor v. State, 666 So.2d 36, 67 (Ala.Cr.App.1994) (the prosecution's alleged failure to establish a proper chain of custody for the bodies of the two victims was not "plain error"; there was no evidence or indication that the bodies had been altered or tampered with), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). Unlike the circumstances in Cook, those here support the recognition of a presumption that, once in the forensic lab, the integrity of the evidence was "suitably preserved."
Under these circumstances, we cannot say that the record regarding the prosecution's presentation of the chains of custody of the DNA-profiling evidence presents plain error.

V.
Thomas contends that the DNA-matching evidence and the DNA-population-frequency-statistical evidence[15] were inadmissible because, he argues, the prosecution did not meet the three-pronged "Frye-plus"[16] standard adopted in Ex parte Perry, 586 So.2d 242 (Ala.1991), for the admission of DNA evidence in Alabama. He specifically contends that the evidence did not establish the third prong: "In this particular case, did the testing laboratory perform generally accepted scientific techniques without error in the [actual] performance or interpretation of the tests?" Id. at 250, 253. In his brief, Thomas concedes that the prosecution presented sufficient evidence to satisfy the first two prongs of the Perry test. (Appellant's Brief, p. 50.) Thus, Thomas concedes that there is a theory generally accepted in the scientific community that supports the conclusion that DNA forensic testing and DNA population frequency statistics can produce reliable results (prong 1 of the Perry test, 586 So.2d at 250, 253). He further concedes that there are current techniques that are capable of producing reliable results in DNA identification and population frequency statistics and that are generally accepted in the scientific community (prong 2, id.).
*50 As noted in Part IV of this opinion, a hearing was held outside the jury's presence before Brewer's testimony, but the record does not disclose at whose request it was held nor does it show that any motion or objection was directed at the admission of the DNA-profiling evidence. The only questions asked by defense counsel, during his three-page cross-examination of Brewer on voir dire, pertain to the facts that the statistics are larger than the population of the United States and that Brewer had never erred on any biannual proficiency tests.
Because defense counsel did not object to any of the DNA evidence on any ground, we review Thomas's argument for plain error only. However, Thomas's allegation does not meet the first requirement of Olano: Was there error? See 507 U.S. at 732-33, 113 S.Ct. 1770.
The Alabama Legislature rejected the Perry test when it enacted § 36-18-30, which governs the admission of DNA evidence at Thomas's trial[17] and provides the following:
"Expert testimony or evidence relating to the use of genetic markers contained in or derived from DNA for identification purposes shall be admissible and accepted as evidence in all cases arising in all courts of this state, provided, however, the trial court shall be satisfied that the expert testimony or evidence meets the criteria for admissibility as set forth by the United States Supreme Court in Daubert []v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579[, 113 S.Ct. 2786, 125 L.Ed.2d 469] (1993)."
The Alabama Supreme Court, in Turner v. State, 746 So.2d 355 (Ala.1998), held that § 36-18-30 supersedes Ex parte Perry. In so holding, the court stated:
"In 1993, two years after this Court's Perry decision, the Supreme Court of the United States overruled the `austere' Frye standard for the admissibility of expert scientific evidence in federal trials. Daubert v. Merrell Dow Pharmaceuticals, Inc. ... In Daubert, 509 U.S. at 589[, 113 S.Ct. 2786], the Supreme Court concluded that Rule 702, Fed. R.Evid., displaced the Frye standard. The Court stated:
"`Frye made "general acceptance" the exclusive test for admitting expert scientific testimony. That austere standard, absent from, and incompatible with, the Federal Rules of Evidence, should not be applied in federal trials.
"`. . . .
"`... Under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'
"Daubert, 509 U.S. at 589[, 113 S.Ct. 2786] (emphasis added). Thus, if scientific evidence passes the two-pronged test of Daubertreliability and relevance it will be admissible and the jury will determine the appropriate weight to give that evidence....
". . . .
"... Unlike Perry, 586 So.2d at 250, Daubert does not require the accuracy of the testing in the particular case to be assessed at the admissibility stage."
746 So.2d at 358-60. See also Maples v. State, 758 So.2d 1 (Ala.Cr.App.1999).
In arguing that the prosecution failed to establish that the techniques used in this case were performed without error, Thomas contends that neither the third *51 prong of Perry nor the "reliability" component of Daubert was established. Thomas's argument, in regard to the application of Perry, is foreclosed by Turner: the third prong of Perry did not survive the enactment of § 36-18-30. For this reason, Thomas's reliance on Ex parte Hutcherson, 677 So.2d 1205 (Ala.1996), is misplaced.
In regard to his Daubert argument, Thomas has used the term "reliability" more broadly than Daubert intended. The reliability component of Daubert does not encompass any finding as to the reliability of the execution of a technique in a particular case unless the technique was so altered as to skew the methodology of the technique itself. We dismiss Thomas's argument with the following:
"The Supreme Court [in Daubert] explained that the proper focus at the admissibility stage is on the `principles and methodology, not the conclusions that they generate.' [509 U.S.] at 595[, 113 S.Ct. 2786]. Once this is determined, the jury is capable of weighing the evidence:
"`[Litigants should not] be overly pessimistic about the capabilities of the jury and of the adversary system generally. Vigorous cross-examination, presentation of contrary evidence, and careful instruction of the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'
"Daubert, 509 U.S. at 596[, 113 S.Ct. 2786]. Unlike Perry, 586 So.2d at 250, Daubert does not require the accuracy of the testing in the particular case to be assessed at the admissibility stage.
". . . .
"... [I]n United States v. Beasley, 102 F.3d 1440, 1446-47 (8th Cir.1996), cert. denied, 520 U.S. 1246[, 117 S.Ct. 1856, 137 L.Ed.2d 1058] (1997), the Eighth Circuit held that under Daubert the defendant's argument concerning the laboratory's testing of the DNA in his particular case went to the weight of the evidence, not its admissibility. Id. at 1448. Under Daubert, a party's challenge to the performance of a reliable and relevant scientific technique in a particular case should warrant exclusion of the scientific evidence only if the `"reliable methodology was so altered ... as to skew the methodology itself."' Id. (quoting United States v. Martinez, 3 F.3d 1191, 1198 (8th Cir.1993), cert. denied, 510 U.S. 1062[, 114 S.Ct. 734, 126 L.Ed.2d 697] (1994))."
Turner, 746 So.2d at 360 (footnote omitted). The court in Turner concluded:
"Whether otherwise reliable testing procedures were performed without error in a particular case goes to the weight of the evidence, not its admissibility. Only if a party challenges the performance of a reliable and relevant technique and shows that the performance was so particularly and critically deficient that it undermined the reliability of the technique, will evidence that is otherwise reliable and relevant be deemed inadmissible."
Id. at 361. Thomas failed to establish that the execution of the techniques was so deficient as to undermine their reliability.[18]
In addition to rejecting Thomas's argument on our finding that execution of the techniques used to arrive at the DNA matching and statistical evidence in this case went to the weight and not the admissibility, we note that we can take judicial *52 notice of the "reliability," as that term is used in Daubert, of the RFLP procedure used to produce DNA matching evidence here. See Turner, 746 So.2d at 358-59, relying on United States v. Martinez, 3 F.3d 1191 (8th Cir.1993), cert. denied, 510 U.S. 1062, 114 S.Ct. 734, 126 L.Ed.2d 697 (1994), for its holding that the reliability of the RFLP procedure is subject to judicial notice and also on Perry, where the Alabama Supreme Court recognized the reliability of the theory and techniques used in RFLP testing.
We also conclude, under the facts of this case, that the technique used to arrive at the DNA-population-frequency-statistical evidence in this case is also reliable under Daubert. We find, contrary to Thomas's argument, that Brewer used the product rule to arrive at his statistics. Brewer testified:
"Q. Are the statistical methods used in your laboratory to calculate an estimate of the significance of a DNA match generally accepted in the relevant scientific community?
"A. Yes. The standard statistical procedures that we use are routinely used in medical and research laboratories as well as forensic laboratories. The 1996 report from the National Research Council[[19]] specifically endorsed these measures."
(R. 329) (emphasis added). Although Brewer did not use the precise term "product rule," by his testimony that he used the "standard statistical procedures" endorsed by the 1996 report of the National Research Council (hereinafter "NRC"), along with his cursory description of the method, we conclude that he used the product rule. The 1996 NCR Report National Research Council, The Evaluation of Forensic DNA Evidence (1996) states that, "[i]n general, the calculation of a profile frequency should be made with the product rule." Id. at 5. See also 2 Paul C. Giannelli & Edward J. Imwinkelried, Scientific Evidence § 18-4, p. 12 (Supp. 1998) ("With some modifications for special situations, the 1996 report endorses the *53 use of the traditional product rule to compute the random match probability.").
Thomas does not dispute the reliability of the application of the product rule in the context of DNA forensic analysis: in his brief to this court, Thomas recognizes that the product rule is "the only valid method of computing the frequency of DNA patterns." (Appellant's Brief, p. 55.) We also note that the rule's reliability has been recognized by a significant number of jurisdictions. See Watts v. State, 733 So.2d 214, 226 (Miss.1999) (citing court opinions from 14 states for its observation that "courts which have considered the admissibility of statistical evidence based on the product rule have determined that the challenges to its use have been sufficiently resolved" and its finding that "the product rule has been accepted in the scientific community and found to be a reliable method of calculating population frequency data"); State v. Kinder, 942 S.W.2d 313, 327 (Mo.1996), cert. denied, 522 U.S. 854, 118 S.Ct. 149, 139 L.Ed.2d 95 ("the overwhelming majority of recent cases in other jurisdictions ... approve the use of the product rule"); State v. Loftus, 573 N.W.2d 167, 174 (S.D.1997) ("an overwhelming amount of scientific commentary and legal authority exist" resolving any earlier dispute concerning DNA statistical evidence, and the "product rule method... is now generally accepted in the relevant scientific community," People v. Chandler, 211 Mich.App. 604, 536 N.W.2d 799, 803 (1995), cert. denied, 453 Mich. 883, 554 N.W.2d 12 (1996)).[20]
Based on the foregoing, we find that the DNA matching and statistical evidence was admissible, without regard to the third prong of Perry. Any question as to the execution of the techniques went to the weight, not the admissibility, of the DNA evidence. Thus, we reject the following arguments, finding that they question the execution of the techniques and, therefore, the weight of the DNA evidence: that the testimony of Brewer that no error had been detected in either the DNA matching or the statistical evidence was too conclusory; that his explanation of the RFLP procedure and of the quality-control mechanisms was too conclusory and oversimplified; that he did not testify to the probability calculation actually used and how it was performed; and that he failed to testify to what the relative frequency of certain DNA patterns in the population and at issue in this case were and how they were determined. In particular regard to the product-rule evidence, see Kinder, 942 S.W.2d at 327 ("Any criticism of the reliability of the product rule or of the particular methods used to apply the product rule pertains only to the weight to be given the DNA evidence by the jury.") See, e.g., United States v. Shea, 957 F.Supp. 331, 343 (D.N.H.1997) (issue whether DNA database was too *54 small to produce reliable probabilities went to weight rather than admissibility, in light of fact that the prosecution's expert followed the recommendations contained in the 1996 NRC Report), aff'd, 159 F.3d 37 (1st Cir.1998), cert. denied, 526 U.S. 1077, 119 S.Ct. 1480, 143 L.Ed.2d 563 (1999); State v. Copeland, 130 Wash.2d 244, 922 P.2d 1304, 1321 (1996) (whether the particular database is large enough is a matter of weight).
The circumstances before us do not compel a finding that plain error occurred upon the admission of the DNA-matching and statistical evidence. In fact, we find no error on the record before us. "Under the circumstances, the trial court could conclude that [the expert's] testimony was the subject of no real dispute, and that his calculations were reliable and generally accepted by the scientific community." Snowden v. State, 574 So.2d 960, 968 (Ala. Cr.App.1990) (in dismissing the appellant's contention, preserved at trial, that the population frequency calculations were not shown to be scientifically reliable or generally accepted in the scientific community, the court observed that the defendant made no specific challenge at trial to the expert witness's conclusion that the methodology of and the calculations upon which his population frequency testimony was based were reliable and generally accepted in the scientific community). We note that defense counsel was alerted by the prosecutor to the mistaken impression that the three-pronged test of Perry applied. Thus, defense counsel was aware of the opportunity to specifically object on a missing Perry prong to correct any possible error.
We further note that had defense counsel objected, any alleged weakness in the evidentiary foundation of the DNA evidence might well have been alleviated by additional evidence. We have no indication that the prosecution could not have produced further evidence, had defense counsel objected. We again call attention to the purposes of the plain-error exception, as discussed supra. See also Perkins v. State, 808 So.2d 1041, 1094 (Ala.Cr.App. 1999) (in finding that the prosecution's failure to meet the third prong of Perry was not plain error, the court noted that Perkins "offers no proof that, had his counsel challenged the DNA evidence at trial ... the State would have been unable to lay a sufficient predicate for admission of the DNA evidence").
In conclusion, we caution that our disposition of this issue is restricted to the particular circumstances of this case. Because the defense did not seriously challenge the prosecution's expert testimony in the trial court, we in no way indicate that this opinion is authority for the proposition that the reliability of the product rule is subject to judicial notice. That holding awaits a full record on the issue.

VI.
Thomas contends, for the first time, that his rights to due process and a fair trial were violated by the testimonies of Officer Stallworth and Nurse Howell and by the admission of Howell's notes because, he argues, they disclosed that he was a prisoner in the jail when Nurse Howell drew a sample of his blood. (Thomas's blood sample was taken on November 1, 1995; he was arrested on August 12, 1995.) He claims that this testimony and evidence "improperly injected [his] bad character into the trial," undermined the presumption of innocence, and suggested to the jury that he was considered dangerous. (Appellant's Brief, p. 56.)
*55 Under a plain-error review,[21] this issue fails to meet the first prong of Olano: Was there error? In so finding, we adopt the rationale of Scott v. Dugger, 686 F.Supp. 1488 (S.D.Fla.1988), aff'd, 891 F.2d 800 (11th Cir.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 224, 112 L.Ed.2d 179 (1990), a review of the denial of a federal writ of habeas corpus in a death-penalty case. There, Scott contended that he was deprived of the presumption of innocence by the testimony of a nurse that she had taken a blood sample from him while he was an inmate at the county jail. In dismissing this claim, the court simply observed, "Her testimony established the chain of custody of a blood sample analyzed by the crime lab. It did not deprive Scott of the presumption of innocence, and the jury was properly instructed on the state's burden at the close of the trial." Id. at 1504.
We likewise find that Stallworth's and Howell's testimonies and Howell's notes were introduced solely to establish the chain of custody for Thomas's blood sample drawn for DNA testing. We also find that this evidence did not deprive Thomas of the presumption of innocence. Furthermore, the jury was properly instructed on the presumption of innocence and the state's burden at the close of trial. See Part III of this opinion, at n. 9.

VII.
Thomas contends that both counts of the indictment were defective because, he argues, they did not allege all of the essential elements of the capital offenses charged. He specifically argues that the murder-rape count (Count I) was fatally defective because it failed to allege that he is "a male." He argues that the murder-burglary count (Count II) was fatally defective because it failed to allege that he remained "unlawfully" in the dwelling and that the victim was "not a participant in the crime."
These allegedly fatal deficiencies were not raised in any manner at trial. Moreover, Thomas did not argue at trial, nor does he do so here, (1) that he is not a male; (2) that he did not unlawfully remain in the dwelling; or (3) that the victim participated in the crime. In fact, the evidence was overwhelmingly to the contrary. In asserting the indictment's alleged deficiencies now, Thomas cites no case regarding any specific alleged deficiency.
Count I charged, in pertinent part, as follows:
"The GRAND JURY ... charge, that... THOMAS ... did knowingly engage in sexual intercourse with [the victim], a female, by forcible compulsion, in violation of 13A-6-61 ..., and during the course of said rape did, with the intent to cause the death of [the victim], cause the death of [the victim], by strangulation, in violation of § 13A-5-40(3)...."
(C.R.6.) The first-degree rape statute, § 13A-6-61, defines the offender as "a male." But see Mims v. State, 500 So.2d 100, 102 (Ala.Cr.App.1986) ("This gender-based code section [ (§ 13A-6-61) ] is applicable to females by virtue of the complicity statutes, §§ 13A-2-23 and 13A-2-25, Code of Alabama 1975."). Although Count I omitted the allegation that Thomas is a male, it otherwise tracked the language of the charging statutes.
Count II charged, in pertinent part, as follows:
"The GRAND JURY ... charge, that... Thomas ... did knowingly and unlawfully enter or remain in the dwelling *56 of [the victim] with the intent to commit a crime therein, to-wit: theft, and while in said dwelling did cause physical injury to [the victim], in violation of 13A-7-5,... and during the course of said burglary did with the intent to cause the death of [the victim], cause the death of [the victim], by strangulation, in violation of 13A-5-40(4)...."
(C.R.6) (emphasis added). Section 13A-7-5(a) provides,
"A person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in [the] dwelling or in immediate flight therefrom, he or another participant in the crime ... causes physical injury to any person who is not a participant in the crime."
(Emphasis added.) See also § 13A-7-1(4), the statutory definition of "enter or remain unlawfully," which uses the modifier "unlawfully" only once for both "enter or remain," as did the indictment in this case.
We are not pressed here to determine whether any of the three alleged deficiencies is an essential element of one of the charged offenses. In the context of plain-error review, we find sufficient instruction in Johnson v. United States, 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). There, the Court found that the trial court did not commit plain error in failing to instruct on and thus submit to the jury the statutory element of "materiality" of the offense of perjury. Following its analysis in Olano, the Court held that the failure to submit the element of materiality to the jury was error; that this error was plain; and that assuming, without deciding, that this plain error affected Johnson's substantial rights, it did not meet the final requirement of Olano. In so holding, the Court explained,
"When the first three parts of Olano are satisfied, an appellate court must then determine whether the forfeited error `"seriously affect[s] the fairness, integrity or public reputation of judicial proceedings" `before it may exercise its discretion to correct the error. Olano, 507 U.S., at 736[, 113 S.Ct. 1770] (quoting Atkinson, 297 U.S., at 160[, 56 S.Ct. 391]).
"In this case that question must be answered in the negative. As the Court of Appeals noted, the evidence supporting materiality was `overwhelming.' ... Materiality was essentially uncontroverted at trial and has remained so on appeal.... Before the Eleventh Circuit and in her briefing before this Court, petitioner has presented no plausible argument that the false statement under oath for which she was convicted ... was somehow not material....
"On this record there is no basis for concluding that the error `seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.' Indeed, it would be the reversal of a conviction such as this which would have that effect. `Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.' R. Traynor, The Riddle of Harmless Error 50 (1970). No `miscarriage of justice' will result here if we do not notice the error, Olano, supra, at 736[, 113 S.Ct. 1770], and we decline to do so."
520 U.S. at 469-70, 117 S.Ct. 1544.
We adopt this analysis for disposing of Thomas's deficient-indictment assertions under the plain-error review. (We find that the trial court's failure to instruct on a material element is sufficiently analogous to the alleged failure of the indictment to state all statutory language so as to qualify as pertinent authority.) In holding *57 that the indictment is not ground for finding plain error here, we point out that the jury was instructed by the trial court, in its oral charge, on the pertinent statutes as written.[22] The jury was instructed on the alleged deficiencies of the indictment. (This fact would be persuasive in finding that Thomas could not satisfy the third requirement of Olano.)

VIII.
Thomas contends that he was denied due process and a fair trial because, he argues, the prosecution failed to establish a chain of custody for the pieces of windowpane glass from the victim's kitchen window (State's Exhibit 30, consisting of two bags stapled together: one marked 10A, containing the broken glass on the ground under the kitchen window, and the other marked S-10B, containing the broken glass from the ground west of the kitchen window). Six latent fingerprints (State's Exhibit 36) lifted from these pieces of glass matched Thomas's known prints. Thomas argues that "no chain of custody whatsoever was established for the broken glass": "[t]he person or persons who retrieved the glass and brought it back [to the forensic lab] were never identified," and "[t]here was absolutely no evidence as to the safeguarding and handling of the glass between the time of its seizure at the scene and the time of its receipt by [Mary Sue] Manci," the forensic expert who lifted the latent prints from the glass and determined them to be those of Thomas. (Appellant's Brief, p. 60.)
Manci, a forensic scientist with the Alabama Department of Forensic Sciences, testified that she "worked" the crime scene along with Dr. Riddick and Investigator Dave Lott, "collecting pieces of evidence that [they] felt would be helpful in helping to solve the crime." (R. 300.) She added, "We took back numerous items." (R. 300.) When asked to list "what all [she] collected or [she] and Mr. Lott collected" (R. 302), she specified that the pieces of glass from which the latent prints were lifted, S-10A and S-10B, were gathered from the ground below the kitchen window and from the ground west of the kitchen window, respectively. She identified the particular packaging of S-10A and S-10B and noted that they contained the broken glass. She also testified, "I was able to recover numerous latent fingerprints from the glass once I came back to the laboratory and processed it...." (R. 309.) After identifying State's Exhibits 32 through 36, with State's Exhibit 36 being the six cards containing the six latent prints, the following occurred:
"Q. Okay. And once you recovered those from the scene, you and Mr. Lott, were they then taken back to the Department of Forensic Science?
"A. I personally took them back to the laboratory."
(R. 313.)
When the prosecutor offered in evidence the latent prints, along with some other items, defense counsel specifically stated, "No objection to any of that, Your Honor." (R. 313.) To the prosecutor's offer of the package containing the broken glass, defense *58 counsel responded, "That's fine." (R. 313.) On cross-examination of Manci, defense counsel asked two questions, both unrelated to the fingerprint identification. Defense counsel gave absolutely no indication that he questioned the authentication of the glass and the latent prints.
Again, defense counsel's affirmative acceptance of exhibits in evidence greatly detracts from any argument now urging plain error in regard to the chain of custody of those exhibits. An objection might have led the prosecution to introduce more specific evidence; there is no indication that the prosecution could not have presented additional evidence, had counsel not indicated he had no objection; and a timely objection would have facilitated a full record on the issue and consideration by the trial court. See discussion on plain error, supra.
Moreover, while Manci's answers were generally not optimally specific, when read together and in the context of the questions asked, her testimony as a whole was specific enough to indicate a complete chain of custody for the pieces of glass. Her testimony identified "[t]he person or persons who retrieved the glass": Manci or Manci and Lott. It also identified who "brought [the glass] back [to the lab]": Manci. Because we find that Manci seized the glass, possibly with the help of Lott, and transported it to the lab, we find to be without merit Thomas's contention that "[t]he person or persons who retrieved the glass and brought it back [to the lab] were never identified." (Appellant's Brief, p. 60.) See Melson v. State, 775 So.2d 857 (Ala.Cr.App.1999) (in a death-penalty case, the trial court was correct in finding the chain of custody of the defendant's shoes to be sufficient even though there was no testimony as to who removed the shoes from the defendant's feet; the evidence that, upon removal, a particular officer took custody of the shoes was sufficient to assure the authenticity and integrity of the shoes); Knotts v. State, 686 So.2d 431, 466 (Ala.Cr.App.1995) (in a death-penalty case, chains of custody were not rendered incomplete by the failure of one investigator who collected the evidence to testify, where he worked as a partner with another investigator in collecting the evidence and that partner did testify), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997). See also United States v. Vasquez, 858 F.2d 1387, 1392-93 (9th Cir.1988) (prosecution laid adequate foundation under Fed.R.Evid. 901 to establish that the fingerprint alleged to be the defendant's was from a package of cocaine from his apartment even though evidence established that the print had been lifted by an officer who did not testify; the officer who matched the print with the defendant's known prints testified that he and the nontestifying officer "lifted all the fingerprints at the same time, in the same room, on the same day," and his testimony established that the fingerprint had to have come from the packages of cocaine taken from the apartment), cert. denied, 488 U.S. 1034, 109 S.Ct. 847, 102 L.Ed.2d 978 (1989). Compare Ex parte Cook, 624 So.2d 511 (Ala.1993) (the trial court erred in overruling the defendant's chain-of-custody objection to the introduction of a knife scabbard, bloody gauze, and socks; a "link" in the items' chains of custody was missing where the witness testified that she only directed and observed the collection of the items by another officer, who did not testify, and where the prosecution did not establish when the items were sealed or how they were handled or safeguarded from the time they were seized by the nontestifying officer until the witness submitted them in sealed envelopes to the forensic serologist, who determined that the blood on the socks seized from the *59 defendant's residence matched the victim's blood type).
In regard to Thomas's assertion that "[t]here was absolutely no evidence as to the safeguarding and handling of the glass between the time of its seizure at the scene and the time of its receipt by Manci" (Appellant's Brief, p. 60.), we recognize that this criterion may be established by circumstantial evidence, with the result being only a "weak" "link," not affecting admissibility.
"Circumstantial evidence is generally sufficient to authenticate the item sought to be entered into evidence, except when there appears to be evidence that the item of evidence was tampered with or that a substitution was made while the item was in custody of the link who has failed to appear and testify."
Ex parte Holton, 590 So.2d 918, 920 (Ala. 1991). Moreover, as recognized in the Commentary to Rule 901, Ala.R.Evid.:
"The evidence of authentication or identification, as under prior Alabama practice, does not have to be conclusive or overwhelming; rather, it must be strong enough for the question to go to the jury. Any weaknesses in the foundational showing, insufficient to call for exclusion, go to the weight that the trier of fact is to give the evidence."
See also Kennedy v. State, 690 So.2d 1222 (Ala.1996.)
"In passing upon the admissibility of ... evidence, `the trial judge should consider the nature of the article and the circumstances surrounding its preservation and custody,' and permit its introduction where continuity of possession is `sufficiently established to afford ample assurance of ... authenticity.'" Magwood v. State, 494 So.2d 124, 144 (Ala.Cr.App.1985) (quoting Washington v. State, 339 So.2d 611, 615 (Ala.Cr.App.), cert. denied, 339 So.2d 616 (Ala.1976)), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). Here, we are concerned ultimately with the authentication of the latent fingerprints. Although Thomas generally states, without any reference to evidence from the record or any authority, that "[f]ingerprints are fragile, and are subject to smearing or other inadvertent alteration, which could drastically affect a fingerprint examiner's comparison" (Appellant's Brief, p. 60), nothing in the record suggests that the glass or the latent prints were altered, tampered with, or substituted. While Manci did not specifically testify as to the handling and safeguarding of the glass, by the very nature of latent fingerprints, any tampering or mishandling of the glass would have destroyed any identifying usefulness. Cf. Johnson v. State, 620 So.2d 679, 692-93 (Ala.Cr.App.1992) (a death-penalty case, relying on Magwood, to hold that a complete chain of custody with regard to latent prints from documents found at the crime scene and later identified as the appellant's did not have to be proved; eyewitness identification was sufficient), rev'd on other grounds, 620 So.2d 709 (Ala.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993). Moreover, Thomas has offered no explanation or theory as to how his prints could have gotten on the glass in any other way except by his own actions.
"[T]he evidence need not negate the remotest possibility of substitution, alteration, or tampering, but instead must prove to a reasonable probability that the item is the same as it was at the beginning of the chain." Slaton v. State, 680 So.2d 879, 893 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997). The prosecution met that standard in regard to the pieces of glass.
*60 Moreover, the record neither offered nor has Thomas alleged any ill will, bad faith, evil motive, or evidence of tampering with the glass and the latent fingerprints by Manci. As noted in Part IV of this opinion, without a showing of any of these, we will presume, particularly under plain-error review, that the integrity of evidence routinely handled by governmental officials was suitably preserved. See Moorman v. State, 574 So.2d 953, 956-57 (Ala.Cr.App.1990). Under the facts as developed in this record we are "persuaded that as a matter of normal likelihood the evidence has been adequately safeguarded" and the trial court properly allowed the jury to consider and assess it in the light of surrounding circumstances. Id.
Furthermore, without deciding the constitutionality of applying § 12-21-13 in a case where the chain of custody is challenged in the trial court, we find merit in the position that it is appropriate to apply the statute where the chain was not contested at all.
In arguing this issue, Thomas relies on Knight v. State, 659 So.2d 931 (Ala.Cr.App. 1993), in which we reversed a criminal conviction for receiving stolen property because the trial court erred in admitting pieces of glass from which the defendant's fingerprints had been lifted and the prosecution had not established a proper chain of custody. Based on the foregoing, we reject the application of Knight here. In addition, we find the circumstances before us more akin to those in Ex parte Scott, 728 So.2d 172, 181-84 (Ala.1998), cert. denied, 528 U.S. 831, 120 S.Ct. 87, 145 L.Ed.2d 74 (1999), a death-penalty case. In Scott, the Alabama Supreme Court rejected Scott's argument that the admission of latent fingerprints, which had been lifted from a stolen vehicle and subsequently identified as those of Scott, was plain error because the prosecution failed to establish a proper chain of custody. The court found no error, even though no evidence was presented concerning the safeguarding and handling of the prints or indicating that the prints were in substantially the same condition when offered at trial as they were when they were lifted at the crime scene. Rather, the lab analyst who lifted the latent prints identified them at trial, and the fingerprint examiner identified them as those she had compared to Scott's known prints. Id. at 183. In finding no error, the court in Scott referred to Knight, but rejected it, given the particular facts before the court. We do likewise.
Based on the foregoing, we find no error and certainly no plain error as defined by Olano.

IX.
Thomas claims, for the first time, that his rights to due process and a fair trial were violated because, he argues, Manci was not qualified as an expert to render the opinion that Thomas's known fingerprints matched latent fingerprints lifted from the broken window glass at the crime scene. Specifically, he argues that Manci did not testify that she had completed or passed her certification test and that her testimony did not establish that she had received appropriate education and training to be qualified to "compare" fingerprints. However, the only objection defense counsel made during Manci's testimony was to the prosecution's offer of two photographs into evidence. He entered no objection to her testimony.
"The admissibility of expert opinions is authorized in this state by § 12-21-160, which reads: `The opinions of an expert on any questions of science, skill, trade, or like questions, are always admissible; and such opinions may be given on the facts as proved by other witnesses.' The criterion for admission of *61 expert testimony is that the witness, by study, practice, experience, or observation as to a particular subject should have acquired knowledge beyond that of an ordinary witness; an expert witness is one who can enlighten the jury more than the average man on the street, one whose knowledge extends beyond or supersedes that of an ordinary witness, or one who is shown, either by training or experience, to be better informed than a hypothetical average juror. Charles v. State, 350 So.2d 730 (Ala.Cr.App.1977); C. Gamble, McElroy's Alabama Evidence § 127.01(5) (3d ed.1977). Whether a witness is sufficiently qualified to testify as an expert is a question for the trial court in its discretion to resolve, and its ruling will not be disturbed on appeal unless there has been abuse of that discretion. Johnson v. State, 378 So.2d 1164 (Ala.Cr.App.), writ quashed, 378 So.2d 1173 (Ala.1979); Radney v. State, 342 So.2d 942 (Ala.Cr.App.1976), cert. denied, 342 So.2d 947 (Ala.1977); C. Gamble, supra, at § 127.01(5)."
Bailey v. State, 574 So.2d 1001, 1002-03 (Ala.Cr.App.1990), quoted in Travis v. State, 776 So.2d 819, 849 (Ala.Cr.App. 1997).
Manci's testimony pertaining to her status as an expert in fingerprint comparison was, as follows:
"Q. And where are you employed, Ms. Manci?
"A. With the Alabama Department of Forensic Sciences.
"Q. And in what capacity are you employed with DFS?
"A. I'm a forensic scientist with a specialty in the trace section, where I do latent fingerprints.
"Q. And what education have you had and training have you had that enables you to perform both jobs that you do out there?
"A.... I have a B.S. degree from the University of South Alabama with a major in biology and minor in chemistry, but I have had extensive training with the Alabama Department of Forensic Sciences, including numerous FBI schools and in-service training within the department."
"Q..... Can you tell us what your qualifications are to do fingerprint comparison analysis?
"A. I have extensive training in latent fingerprints, and also I have sat for a certification test that is administered by the International Association for Identification. It's a very in-depth testing where they certify you as a latent fingerprint [sic] if you complete it. It's a timed test."
(R. 298-99, 307.) After this testimony, Manci used one of the latent fingerprints and the corresponding known print, both of which had been enlarged for court presentation, to explain to the jury how latent and known fingerprints are compared and matched.
We find this testimony to be sufficient to support Manci's status as an expert in fingerprint comparison analysis, particularly in light of the fact that defense counsel in no manner questioned at trial her being sufficiently qualified to be such an expert.

X.
Thomas contends that his rights to due process and to a fair trial were violated by the admission of Manci's testimony that Thomas's fingerprints matched the latent prints lifted from the broken glass from the victim's kitchen window, specifically contending that her testimony was based on inadmissible hearsay, because, he argues, *62 the fingerprint card containing his known prints (State's Exhibit 31) was not authenticated by any witness. Thomas is correct in his assertion; the only reference to his fingerprint card was Manci's testimony that she had been given the known prints. (R. 308.)
In support of this argument, Thomas relies on Gardner v. State, 530 So.2d 250, 257 (Ala.Cr.App.1987), aff'd, Ex parte Weaver, 530 So.2d 258 (Ala.1988), and on Bighames v. State, 440 So.2d 1231, 1235-36 (Ala.Cr.App.1983). In Gardner, the trial court overruled defense counsel's objection that the expert could not know that the alleged known fingerprints were in fact those of the defendant because he had not fingerprinted the defendant. The court, in discussing this ruling, quoted the following from Bighames, 440 So.2d at 1235:
"`The general rule is that the identification expert must have personal knowledge of the person whose fingerprints are on the fingerprint card before that witness can testify that the card bears the fingerprints of a specific individual. People v. Zirbes, 6 Cal.2d 425, 57 P.2d 1319, 1322 (1936). Otherwise, the expert's testimony constitutes hearsay and the admission of the fingerprint card is improper. Zirbes, supra. See also State v. Seales, 245 Iowa 1074, 65 N.W.2d 448 (1954); People v. Hardnett, 45 Mich.App. 247, 206 N.W.2d 470 (1973).'"
530 So.2d at 257. The court then noted, "Although fingerprint records may be admitted as business records, Bighames v. State, supra, the prosecutor did not qualify appellant Weaver's fingerprint card as a business record under Code of Alabama (1975), § 12-21-43." 530 So.2d at 257. (The court disposed of the issue by concluding that, "even if the admission of the fingerprint card[] was improper, that error was harmless in view of the other evidence against appellant Weaver." Id. However, the Alabama Supreme Court explicitly rejected the harmless-error rationale on certiorari review in regard to another issue. 530 So.2d at 257-58.)
In Bighames v. State, the trial court admitted Bighames's fingerprint card into evidence even though the technician who made the card could not positively identify Bighames as the individual whose prints she had taken. After noting that "a good argument can be made" that the record contained sufficient information to authorize the admission of the card as a business record, 440 So.2d at 1235, the court continued,
"Additionally, we note that the finger-print card was signed `Ralph Bighames.' `The general rule is well settled that identity of name imports, prima facie, identity of person.' Esco v. State, 278 Ala. 641, 643, 179 So.2d 766 (1965). See also Freeman v. Hall, 286 Ala. 161, 165, 238 So.2d 330 (1970). No evidence was presented to rebut this presumption. McCord v. State, 373 So.2d 1242, 1244 (Ala.Cr.App.1979); Williams v. State, 364 So.2d 717, 719 (Ala.Cr.App.1978); Dunaway v. State, 50 Ala.App. 200, 202, 278 So.2d 200, cert. denied, 291 Ala. 93, 278 So.2d 205 (1973)."
Id. (The court concluded that even if the admission of Bighames's fingerprint card was improper, that error was harmless in view of the overwhelming evidence of guilt. But see Weaver, 530 So.2d at 259.)
We review this issue for plain error only. As noted in Part I of this opinion, during Manci's testimony about Thomas's known fingerprint card, the prosecutor stated that he had previously shown Exhibit 31 to defense counsel. (R. 308.) When the prosecutor offered Thomas's known fingerprint card along with some other items in evidence, defense counsel specifically stated, "No objection to any of *63 that, Your Honor." (R. 313.) We again refer to our discussion regarding plain error, supra, recognizing that the plain error exception to the contemporaneous objection rule should be narrowly applied. As in his chain-of-custody challenges, defense counsel announced that he had no objection to the admission of the known finger-print card; he offers no argument, and the record does not suggest, that the finger-prints on the card were not in fact those of Thomas; a timely objection would have facilitated a full record on the issue and consideration by the trial court. Any possible lapse in the prosecution's proof in regard to the fingerprint card might well have been supplied at trial, had defense counsel objected to its admission. In this instance, it is appropriate to observe the principle reiterated in Bighames: "identity of name imports, prima facie, identity of person." Here, as in Bighames, no evidence was presented to rebut this presumption.
Moreover, as we recognized in Part VIII of this opinion, evidence of authentication or identification may be circumstantial, and it does not have to be conclusive or overwhelming, for the question to go to the jury. See also generally 2 Gamble, supra, at § 316.01(2). Because Rule 901(a), Ala.R.Evid., which sets out the prerequisite of authentication or identification for admissibility of evidence, is identical to its federal counterpart, we find the following discussion in United States v. Lopez, 758 F.2d 1517, 1520-21 (11th Cir. 1985), cert. denied, 474 U.S. 1054, 106 S.Ct. 789, 88 L.Ed.2d 767 (1986), to be pertinent and adopt it in denying Thomas's claim.
"Defendant argues that the fingerprint card and expert testimony linking the prints on the card to Lopez were improperly admitted hearsay. `Determinations of admissibility of evidence rest largely within the discretion of the trial judge and will not be disturbed on appeal absent a clear showing of an abuse of discretion.' United States v. Russell, 703 F.2d 1243, 1249 (11th Cir.1983) (citing United States v. Gorel, 622 F.2d 100, 105 (5th Cir.1979)), reh'g denied, 708 F.2d 734 (1983). Defendant seems to argue that the fingerprint evidence is inadmissible for lack of authentication. Federal Rule of Evidence 901 provides that the `requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what proponent claims.' Lopez contends that the evidence is inadmissible because the Government failed to offer any evidence identifying the source of the fingerprints on the fingerprint card. `It is clear that connection of physical evidence with a defendant may be shown by circumstantial evidence.' United States v. Soto, 591 F.2d 1091, 1099 (5th Cir.1979), cert. denied, 442 U.S. 930[, 99 S.Ct. 2862, 61 L.Ed.2d 298] (1979). There is ample circumstantial evidence to infer that the fingerprints on the card marked `Martin-Lopez' are those of the defendant. Government counsel proffered sufficient information to the court to place the admission of the card within the broad discretion of the court. The trial court's determination of admissibility of evidence will not be disturbed absent a clear abuse of discretion. United States v. Russell, 703 F.2d 1243, 1249 (11th Cir.1983). Government counsel advised the court that the fingerprints of defendant had been obtained pursuant to court order by an F.B.I. agent in the building. The expert testified that the prints on the card matched those on the plastic shopping bag [containing the cocaine received by the confidential informant]. Thus there is sufficient circumstantial evidence from which to infer *64 that the print card was the result of the fingerprinting by the F.B.I. agent. Defendant's argument is in substance a challenge to the chain of custody of the print card. Challenge to the chain of custody goes to the weight rather than the admissibility of the evidence. United States v. Henderson, 588 F.2d 157, 160 (5th Cir.1979), cert. denied, 440 U.S. 975[, 99 S.Ct. 1544, 59 L.Ed.2d 794] (1979); United States v. Clark, 664 F.2d 1174, 1176 (11th Cir.1981). Thus, the adequacy of the proof relating to the chain of custody is not a proper ground to challenge the admissibility of the evidence."
See also Magwood v. State, 494 So.2d at 144 ("Chain of custody requirements do not apply with the same force to items of evidence which are unique and identifiable in themselves[, e.g.,] fingerprint and palm print exhibits....").
The question in this case, to have been addressed by proper proof of authentication, was whether the fingerprints on the fingerprint card were Thomas's. Although the prosecution should have laid a proper foundation for the card, by other information, the record presents ample circumstantial evidence from which one could reasonably conclude that the fingerprints on Exhibit 31 were those of Thomas. The fingerprint card indicated that the birth date of the subject was December 8, 1970. At arraignment, Thomas himself verified to the trial court that his birth date was December 8, 1970. (R. 6.) In addition, defense counsel at sentencing stated that he and Thomas had reviewed the presentence report and that there were no additions or corrections. (R. 494-95.) The pertinent information on Thomas's presentence report showed the same date and place of his birth. Moreover, the following additional information on the fingerprint card corresponded with information in the presentence report: Social Security number, height, eye color, sex, and race. The weight varied by two pounds from the weight on the presentence report. The date on the card on which the fingerprinted subject was "arrested or received" was September 17, 1992. The presentence report showed that same date as the date Thomas was arrested for second degree theft of property. The only discrepancy between the card and the report was that the card stated the subject had brown hair and the report stated Thomas had black hair. Furthermore, the information on the cardbirth date, Social Security number, height, weight, race, sex, and eye and hair colorcorresponded to that reflected on the case action summaries of Thomas's two prior convictions. (Defense counsel, at sentencing, stated that he would not dispute that Thomas was under a sentence of imprisonment at the time of the capital offense, based on these two case action summaries (R. 491).)
The distinctive information on the fingerprint card and its similarity to other pertinent information provide a solid corroborative basis for our finding that the admission of the card was not plain error, as defined by Olano. The information on the card, when considered in conjunction with the surrounding circumstances, including the match of Thomas's pints with those left on the window glass, gives rise to a strong inference that the card is what it purports to be. See, e.g., State v. Thompson, 166 Ariz. 526, 803 P.2d 937, 938 (App.1990) (sufficient foundation was presented from which the trier of fact could conclude that a particular set of documents was an authentic record of the appellant's prior conviction under Ariz.R.Evid. 901(a) where "Appellant's name was on all the separate items in the exhibit [and] the fingerprints, physical description, and birth date matched appellant, as did the date of the prior offense"). Cf. Rule *65 901(b)(4) and Comments to the Alabama Rules of Evidence (recognizes, by way of illustration only, as an example of authentication or identification conforming with the requirements of this rule, that a document may possess characteristics so distinctive that, when considered in light of the circumstances, they may support a finding that the item in question is what its proponent claims it is).[23]

XI.
Thomas contends that the evidence was insufficient to support his conviction, under Count II of the indictment, for the capital offense of murder committed during a burglary because, he argues, there was no evidence that he "remained unlawfully" in the victim's dwelling.
Section 13A-7-5(a)(2), Ala.Code 1975, provides, in pertinent part:
"A person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in [the] dwelling or in immediate flight therefrom, he or another participant in the crime ... [c]auses physical injury to any person who is not a participant in the crime...."
"A person `enters or remains unlawfully' in or upon premises when he is not licensed, invited or privileged to do so." § 13A-7-1(4). The "unlawful remaining" prong of Alabama's burglary statute "cover[s] cases where a person enters with license or privilege but remains after termination of such license or privilege." Commentary to § 13A-7-1.
In arguing this issue, Thomas relies on Ex parte Gentry, 689 So.2d 916 (Ala.1996). However, since the filing of his brief, the specific holding in Gentry, upon which Thomas relies, has been overruled by Davis v. State, 737 So.2d 480 (Ala.1999). In Davis, the Alabama Supreme Court clarified the standard for determining when a person "remains unlawfully," as that term is used in § 13A-7-5, in stating the following:
"Evidence of a struggle that gives rise to circumstantial evidence of revocation of a license or privilege can be used to show an unlawful remaining, a separate prong of the offense of burglary upon which a conviction can be based....
"We reiterate that the evidence of a commission of a crime, standing alone, is inadequate to support the finding of an unlawful remaining, but evidence of a struggle can supply the necessary evidence of an unlawful remaining. In homicide cases, the mere fact of the victim's death cannot be equated with a struggle. For example, evidence of a privileged entry followed by death from an injury inflicted by surprise or stealth and causing instantaneous death would not constitute circumstantial evidence of an unlawful remaining. Likewise, a privileged entry followed by death from an injury inflicted by a delayed mechanism, such as poison, would be equally deficient.
"The evidence was sufficient for the jury to find that Davis killed [the victim] during a burglary. The evidence of a struggle giving rise to the inference of an unlawful remaining is supplied by *66 Davis's choice to kill by a less-than-instantaneous technique of strangulation and by his use of three nonfatal stab wounds to the victim's lower back. Based on the circumstances suggested by the evidence, the jury reasonably could have found that Davis, from the point at which he began committing his criminal acts, `remain[ed] unlawfully' in [the victim's] home with the intent to commit a crime."
737 So.2d at 483-84, quoted in Freeman v. State, 776 So.2d 160 (Ala.Cr.App.1999).
In applying these principles to the evidence presented by the prosecution, the evidence of the trespassory element of burglaryThomas's "remain[ing] unlawfully" in the victim's homewas clearly sufficient for the jury to reasonably find that Thomas intentionally killed the victim during his commission of a burglary. The evidence giving rise to the inference of an unlawful remaining included evidence of strangulation and three nonfatal stab wounds, as did the evidence relied upon in Davis to support the burglary component of capital murder. Additional evidence of revocation of Thomas's license or privilege to remain, assuming he entered lawfully, is the rape of the victim. We find no error. The issue of guilt under Count II was properly submitted to the jury.

XII.
In his brief on submission, Thomas contended that a remand was required because, he argued, the prosecutor failed to give a reason for striking veniremember number 81, B.K., an Asian-American male. In his reply brief, Thomas concedes, as the attorney general correctly pointed out, that the prosecutor did give the following race-neutral reason for striking veniremember number 81:
"Number 74 [M.J., a black female] is single, unemployed. I struck [K.L., number 68] who was a similarly situated white male.... I struck number 81 [B.K.] for the same reason, all three of them, two men, one woman all for one reason."
(R. 119) (emphasis added). Thomas withdraws this issue from any further consideration.

CONCLUSION
In regard to the guilt phase of Thomas's trial, we again quote the following discussion by the United States Supreme Court:
"On this record there is no basis for concluding that [any] error [in the guilt phase] `seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.' Indeed, it would be the reversal of a conviction such as this which would have that effect. `Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.' R. Traynor, The Riddle of Harmless Error 50 (1970). No `miscarriage of justice' will result here if we do not notice [any] error, Olano, supra, [507 U.S.] at 736[, 113 S.Ct. at 1779], and we decline to do so."
Johnson v. United States, 520 U.S. at 470, 117 S.Ct. 1544.
However, pursuant to the attorney general's request that this cause be remanded "with instructions that a proper and complete sentencing order be entered" (State's Brief, p. 94), this cause is remanded with instructions to the trial court to enter a proper sentencing order that meets the requirements of § 13A-5-47. The attorney general asks that the following deficiencies of the sentencing order be corrected on remand:
"A. The trial court's sentencing order does not make the required findings on the existence or nonexistence of each statutory aggravating circumstance, *67 each statutory mitigating circumstance, and any nonstatutory mitigating circumstances considered. [See § 13A-5-47(d).]"
"B. The trial court's sentencing order does not make a finding [in regard to whether] the aggravating circumstances outweigh the mitigating circumstances. [See § 13A-5-47(e).]"
"C. The trial court's sentencing order does not state that its findings were based upon the trial evidence, the sentencing evidence, and the presentence report. [See § 13A-5-47(d).]"
(State's Brief 91, 93, 94.) We so instruct the trial court.
We pretermit discussion of any sentencing issue until the trial court's revised sentencing order is filed with this court, no later than 56 days from the issuance of this opinion.
Accordingly, this cause is remanded.
The foregoing opinion was prepared by Retired Appellate Judge John Patterson while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Ala.Code 1975.
REMANDED WITH INSTRUCTIONS.
LONG, P.J., and McMILLAN, BASCHAB, and FRY, JJ., concur; COBB, J., recuses herself.

On Return to Remand
PATTERSON, Retired Appellate Judge.
The appellant, Billy Jack Thomas, appeals from his sentence of death on his convictions for the capital offenses of murder of B.W.L. during a rape in the first degree, § 13A-5-40(a)(3), Code of Alabama 1975, and of murder of B.W.L. during a burglary in the first degree, § 135-40(a)(4). In an opinion issued December 30, 1999, this court affirmed Thomas's convictions, but remanded for the trial court to enter a proper sentencing order pursuant to the requests of Thomas's appellate counsel and the attorney general. Thomas v. State, 824 So.2d 1 (Ala.Cr.App.1999). We pretermitted discussion of any sentencing issues until the revised order was filed with this court on return to remand. That has been done. We now consider Thomas's contentions regarding his sentencing.
The jury unanimously recommended death for Thomas's murder-rape conviction and recommended, by a vote of 10 to 2, death for Thomas's murder-burglary conviction. The jury arrived at these recommendations after 10 minutes of deliberation.
The trial court subsequently sentenced Thomas to death, after considering the jury's recommendations and finding the following aggravating circumstances: that the capital offense[1] was committed by a person under sentence of imprisonment, as evidenced by Thomas's two prior convictions, § 13A-5-49(1); that the capital offense was committed while Thomas was engaged in the commission of rape, § 135-49(4); that the capital offense was committed while Thomas was engaged in the commission of burglary, § 13A-5-49(4); and that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses, § 13A-5-49(8). The *68 trial court specifically rejected each mitigating circumstance enumerated in § 135-51. The trial court's order further states:
"In regard to nonstatutory mitigating circumstances, the defendant's mother testified that he did not present any problems to her growing up; that he never hurt anybody, and that he has three children. The defendant's ex-wife testified that they have two children together, five and seven years old; that the defendant, to her knowledge, has never been cruel to her, the children or anyone else."
(Remand Transcript, p. 10.)
Thomas raises four issues concerning the trial court's jury instructions in the sentencing phase. Thomas's trial counsel requested no specific instruction in the sentencing phase nor did he object after the trial court's introductory charge or after the charge given immediately before the jury's deliberation. Thus, we review Thomas's contentions under the limited plain-error review. Ala.R.App.P. 45A.
However, we also take heed of the following:
"[T]he sentencing stage is a `due process hearing of the highest magnitude,' Richardson v. State, 376 So.2d 205, 224 (Ala. Cr.App.1978), aff'd, 376 So.2d 228 (Ala. 1979), and ... a reviewing court must carefully analyze the jury instructions to determine if the trial court has fulfilled its duty to properly inform the jury. Proper instructions are absolutely indispensable if the jury is to effectively perform its role in this crucial proceeding."
Ex parte Stewart, 659 So.2d 122, 127 (Ala. 1993) (footnote omitted) (remanded for new sentencing hearing before the jury because the trial court erroneously instructed the jury that it could find nonstatutory aggravating circumstances from the facts of the case itself). It is within this context that we review the following issues for plain error:
"Did the trial court err by failing to instruct the jury on the burden of proof with respect to aggravating circumstances and mitigating circumstances?"
"Did the trial court err by instructing the jury on all statutory aggravating circumstances, when they were not all supported by the evidence and the jury could easily have found the existence of an inapplicable aggravating circumstance?"
"Did the trial court's instructions to the jury incorrectly define the heinous, atrocious [or] cruel aggravating circumstance?"
"Was the jury improperly instructed that it could find the aggravating circumstance of murder committed during a first-degree burglary, and is the trial court's sentencing order defective for finding this aggravating circumstance, when there was no proof that appellant `remained unlawfully' in the deceased's dwelling?"
(Appellant's brief, pp. 12-13.)
Thomas bases this last issue on the argument presented in Issue XI of his brief: that the evidence presented in the guilt phase was insufficient to establish that he either entered unlawfully or remained unlawfully in the victim's dwelling, an element of the burglary component of the capital offense of murder-burglary However, we found, in Part XI of our December 30, 1999, opinion, that the guiltphase evidence was clearly sufficient from *69 which the jury could reasonably find that Thomas did in fact remain unlawfully in the victim's dwelling. We accordingly find that the trial court properly instructed the jury in the sentencing phase of the aggravating circumstance that the capital offense was committed while the defendant was engaged in the commission of burglary.
Any question as to the first three contentions listed above could have easily been avoided had the trial court followed the Alabama Pattern Jury Instructions: Criminal, "Pattern Jury Instructions for Use in the Penalty Phase of a Capital Case." It is the preferred practice to use these pattern jury instructions.[2]Hagood v. State, 777 So.2d 214 (Ala.1999); Stewart v. State, 730 So.2d 1203, 1211 (Ala.Cr.App. 1996), aff'd, 730 So.2d 1246 (Ala.1999).
Instead of following even the framework of the recommended pattern instructions, the trial court read from the Alabama Criminal Code. Before opening arguments, the court read to the jury all but the last sentence of § 13A-5-46 (informing the jury of a defendant's right to waive a sentencing hearing before a jury; of the procedure in the event a defendant waives that hearing; of the procedure if the jury that rendered the guilt-phase verdict(s) cannot sit for the sentencing hearing; of the procedure if the case is remanded for a new sentencing hearing before a jury; of the sequestration of the jury; and of the procedure if the jury is unable to reach an advisory sentencing verdict). The court then read an abridged version of § 13A-5-47 (informing the jury that after receiving the advisory verdict, the trial court would order that a presentence investigation be conducted and a presentence report be submitted and then stating, "I will have to go through the same process that you do, weighing the aggravating and mitigating circumstances in addition to the other considerations." (R. 450; emphasis added.)) (The court's charge to this point consisted of improper subjects of instruction for the jury. See, e.g., Ex parte Giles, 554 So.2d 1089 (Ala.1987) (charge on the effect of a nonunanimous verdict on the sentence, under Alabama's old capital statue, Ala.Code 1975, §§ 13-11-1 through -8, was not a proper subject of instruction for the jury; this information was for the trial court only); Coulter v. State, 438 So.2d 336, 346 (Ala.Cr.App.1982), aff'd, 438 So.2d 352 (Ala.1983) (same).) Next, the court read § 13A-5-48 (describing the process of weighing the aggravating and mitigating circumstances); § 13A-5-49 (listing the facts that "shall be" aggravating circumstances);[3] and § 13A-5-50 (allowing for *70 the aggravation component of the offense to be considered also as an aggravating circumstance as specified in § 13A-5-49). The court then explained that, by entering the guilty verdicts, the jury had found beyond a reasonable doubt the existence of the aggravating circumstances that the murder had occurred during a first-degree rape and a first-degree burglary.[4] Thereafter, the court read the list of statutory mitigating circumstances, § 13A-5-51, and read § 13A-5-52 (allowing for nonstatutory mitigating circumstances).
In its final oral charge, the trial court read § 13A-5-46(d) (explaining that the jury would deliberate after the court instructed the jury on its function and on the relevant law), § 13A-5-46(e) (setting out the three options for the advisory verdict), § 13A-5-48 (defining the process for weighing the aggravating circumstances and the mitigating circumstances), and § 13A-5-49 (listing the aggravating circumstances). It then gave a one-sentence limiting definition of the "especially heinous, atrocious or cruel" aggravating circumstance and read § 13A-5-50 (allowing for the aggravation component of the offense to also be considered as an aggravating circumstance as specified in § 13A-5-49), § 13A-5-51 (listing the statutory mitigating circumstances), and § 13A-5-52 (providing for nonstatutory mitigating circumstances).
Thomas correctly asserts, in Issue XV of his brief, that the trial court erroneously defined to the jury the aggravating circumstance that the capital offense was especially heinous, atrocious or cruel compared to other capital offenses, § 13A-5-49(8). The trial court instructed, "In considering the aggravating circumstance that the homicide is heinous, atrocious or cruel when compared to other capital offenses is confined to those homicides which are consciousless [sic] or pitiless or which are unnecessarily tortuous [sic] to the victim." (R. 481; emphasis added.)
"Alabama has restricted its `heinous, atrocious, or cruel' circumstance to application only in a crime `of such a nature that it is "conscienceless or pitiless" and "unnecessarily torturous to the victim,"' *71 Ex parte Whisenhant, 555 So.2d 235, 244 (Ala.1989) ... (quoting Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981))." Lawhorn v. State, 581 So.2d 1159, 1174-75 (Ala.Cr.App.1990), aff'd, 581 So.2d 1179 (Ala.1991) (emphasis added).
"The Supreme Court has held that the `especially heinous, atrocious, or cruel' aggravating circumstance provides ... a principled distinction [between cases in which the death penalty is appropriate from cases in which it is not] only where the state appellate courts employ a consistent and narrow interpretation of that circumstance to channel the discretion of the sentencer. See [Maynard v.] Cartwright, 486 U.S. [356,] 365-66, 108 S.Ct. 1853, 100 L.Ed.2d 372 [(1988)]....
"In Lindsey v. Thigpen, 875 F.2d 1509 (11th Cir.1989), the United States Court of Appeals for the Eleventh Circuit ... emphasized that the Alabama appellate courts' interpretation of § 13A-5-49(8) passed muster under the Eighth Amendment because this Court and the Court of Criminal Appeals had consistently defined `especially heinous, atrocious or cruel' to include only `those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' Lindsey v. Thigpen, at 1514 (quoting Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981)) (emphasis added)."
"... The State urges us to hold that the ... murder in this case, for which the record does not reflect torture of the victim, is nonetheless `especially heinous, atrocious or cruel.' Such an expansion of the aggravating circumstance set out in § 13A-5-49(8) to encompass a murder not involving torture ... would abandon the very interpretation that the Eleventh Circuit held critical to the constitutional application of that aggravating circumstance. Indeed, the Supreme Court of the United States has held that a state supreme court's failure to apply its previously recognized limiting construction of an aggravating circumstance, which required a finding of torture or aggravated battery of the victim, rendered the application of the aggravating circumstance unconstitutional. Godfrey [v. Georgia], 446 U.S. [420,] 429, 432, 100 S.Ct. 1759, 64 L.Ed.2d 398 [(1980)].
"We cannot depart from the established meaning of the words enacted by the Legislature'especially heinous, atrocious or cruel'and apply those words to include murders that do not involve the infliction of torture on the victim. Such a departure would abandon the essential characteristic that made our previous applications of § 13A-5-49(8) compatible with the Eighth Amendment."
Ex parte Clark, 728 So.2d 1126, 1138, 1140-41 (Ala.1998) (footnote omitted).
Considering the clear rule set forth by this caselaw and followed consistently by Alabama courts, we cannot understand the attorney general's assertion that the charge in this case "`closely follows the language of the charge recommended by the Alabama Supreme Court for use in capital cases, and clearly informed the jury as to the type of conduct that must be present before that aggravating factor should be applied.'" (State's brief, p. 84; quoting Travis v. State, 776 So.2d 819, 865 (Ala.Cr.App.1997)). Rather, we agree with Thomas that the use of the disjunctive coordinating conjunctive "or" in the court's charge allowed the jury to find this aggravating circumstance under a much broader definition than approved, i.e., without a finding that the murder was unnecessarily torturous. Compare Slaton v. State, 680 *72 So.2d 879, 902-03 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996).
In Issue XIII of his brief, Thomas contends that the trial court erroneously failed to instruct the jury on the burdens of proof with respect to the aggravating and mitigating circumstances. He asserts that this failure deprived him of due process and of a fair jury trial under the Fifth, Sixth, and Fourteenth Amendments and that it also subjects him to cruel and unusual punishment in violation of the Eighth Amendment.
Section 13A-5-45, which the trial court did not read to the jury, provides in pertinent part, as follows:
"(e) At the sentencing hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances. Provided, however, any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.
". . . .
"(g) The defendant shall be allowed to offer any mitigating circumstance defined in Sections 13A-5-51 [which lists the statutory mitigating circumstances] and 13A-5-52 [which provides for nonstatutory mitigating circumstances]. When the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence."
Thomas is correct in his assertion that the trial court's instruction did not comply with the above statutory requirements. In fact, the court never mentioned any burden, either the word "burden" or the concept of a burden. Moreover, the court's only mention of "reasonable doubt" was its attempt in its opening instructions to explain the operation of § 13A-5-50, which allows the jury to find as an aggravating circumstance, as specified in § 135-49 for sentencing purposes, the aggravation component of the capital offense for which the defendant has been convicted. After reading the statute, the court instructed: "What that means is for you to have found the Defendant guilty under Counts One and Two, you must have found beyond a reasonable doubt that the murder took place during ... rape in the first degree and burglary in the first degree." (R. 452.) The trial court did not again utter the words "reasonable doubt." Compare the recommended instructions of Pattern Jury Instructions, which repeatedly mention that any proposed aggravating circumstance must be proven beyond a reasonable doubt for it to be considered in weighing the aggravating circumstances against the mitigating circumstances. With this sole reference to "reasonable doubt," the trial court obviously did not refer the jury back to its instruction on reasonable doubt in the guilt phase. Compare the Pattern Jury Instructions, pp. 83-84, which three times refer the jury to the definition given in the guilt phase.[5] Thus, we reject the attorney general's sole argument that, by the court's instruction on reasonable doubt in the guilt phase, the jury was in effect instructed that it was to scrutinize the proposed aggravating circumstances under the "beyond-a-reasonable-doubt" *73 standard. Finally, we point out that the trial court did not give any instruction informing the jury as to the burdens of proof for the proposed mitigating evidence.
The pertinent instructions recommended by the Pattern Jury Instructions, pp. 82-83, 86-87, 89-90, but not given here, are as follows:
"The law of this state provides a list of aggravating circumstances which may be considered by the jury in recommending punishment if the jury is convinced beyond a reasonable doubt from the evidence that one or any of such aggravating circumstances exist in this case. The same definitions that I gave to you [Insert time of guilt stage instructions] concerning reasonable doubt apply to this matter also.
". . . .
"Now as I stated to you before, the burden of proof is on the State to convince each of you beyond a reasonable doubt as to the existence of any aggravating circumstance(s) considered by you in determining what punishment is to be recommended in this case.... In deciding whether the State has proven beyond a reasonable doubt the existence of any given aggravating circumstance you should bear in mind (and I repeat again,) the definition I gave to you as to reasonable doubt.
"The evidence upon which a reasonable doubt about an aggravating circumstance may be based is both the evidence you heard in the guilt stage of this trial and the evidence you have heard in this sentence hearing. The defendant does not have to disprove anything about an aggravating circumstance. The burden is wholly upon the State to prove such a circumstance beyond a reasonable doubt. A reasonable doubt about an aggravating circumstance may arise from all of the evidence, from any part of the evidence or from a lack or failure of the evidence.... [Y]ou may not consider an aggravating circumstance unless you are convinced by the evidence beyond a reasonable doubt of the existence of that aggravating circumstance in this case.
". . . .
"A mitigating circumstance considered by you should be based on the evidence you have heard. When the factual existence of an offered mitigating circumstance is in dispute, the State shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence. The burden of disproving it by a PREPONDERANCE OF THE EVIDENCE means that you are to consider that the mitigating circumstance does exist unless, taking the evidence as a whole, it is more likely than not that the mitigating circumstance does not exist. Therefore, if there is a factual dispute over the existence of a mitigating circumstance, then you should find and consider that mitigating circumstance unless you find the evidence is such that it is more likely than not that that mitigating circumstance does not exist. Only an aggravating circumstance must be proven beyond a reasonable doubt, and as I have stated to you many times, the burden is on the State of Alabama to convince you from the evidence beyond a reasonable doubt and to a moral certainty that such an aggravating circumstance did exist."
Thomas admits that the jury found two aggravating circumstances under a reasonable-doubt instruction: the two established as a matter of law by the jury's verdicts, which were based on findings under the reasonable-doubt instruction in the guilt phase. See § 13A-5-45(e) ("any aggravating *74 circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing"). See also Lawhorn v. State, 581 So.2d at 1170 (recognized by this statute and § 13A-5-50 and implicit in their operation is the fact that the jury, by its verdict, had already made, in essence, the "critical inquiry" of whether the aggravating circumstance encompassed in the indictment is present beyond a reasonable doubt).
However, we agree with Thomas that the jury's consideration of any other aggravating circumstance was invalid because it was not guided by sufficient instruction, i.e., an instruction that the prosecution must convince each juror beyond a reasonable doubt as to the existence of any aggravating circumstance. We further agree with Thomas that this error would not have been cured by any errorless exercise on the part of the trial court in its role as the ultimate sentencing authority. See Ex parte Williams, 556 So.2d 744, 745 (Ala.1987) ("independent state law grounds" and "statutory construction" prohibit a finding of harmless error where the jury has been instructed on an invalid aggravating circumstance even though the trial court disregarded that circumstance in its role as the ultimate sentencing authority (and found, as the sole aggravating circumstance, the aggravation component of the capital offense and no mitigating circumstance)). See also Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992) (error committed when the jury considers an invalid aggravating factor and its verdict is in turn considered by the trial court is not cured even though the trial court does not consider the invalid factor).
In regard to the trial court's failure to instruct on the burdens in regard to mitigating circumstances, we note that the United States Supreme Court in Buchanan v. Angelone, 522 U.S. 269, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998), held that the Eighth and Fourteenth Amendments of the United States Constitution do not mandate that a trial court give any instruction whatsoever regarding mitigating circumstances, as long as a jury is not precluded from considering mitigating circumstances.
"However, nothing in Buchanan changes the fact that Alabama law does entitle capital defendants to a sentencing-phase instruction on mitigating circumstances. It is well settled that `every accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however weak, insufficient, or doubtful in credibility.' Chavers v. State, 361 So.2d 1106, 1107 (Ala.1978), citing Burns v. State, 229 Ala. 68, 155 So. 561 (1934). Although this maxim has been used most frequently to grant defendants jury charges on lesser-included offenses and affirmative defenses, it is equally applicable to entitle capital defendants to a jury instruction on mitigating circumstances, so long as some evidence has been presented to support a finding of mitigating circumstances. Therefore, because [the accused] presented some evidence of mitigating circumstances, he was entitled to an appropriate jury instruction on mitigating circumstances."
Ex parte Wood, 715 So.2d 819, 822 (Ala. 1998) (emphasis in original). As a matter of state law, Thomas was entitled to appropriate instructions on mitigating circumstances, including the principle that if the prosecution does not disprove the factual *75 existence of a mitigating circumstance by a preponderance of the evidence, the jury is to find and consider that circumstance.
Taking all the instructional errors cumulatively,[6] we are constrained to find that the jury was without sufficient guidance to make a proper determination of the presence or absence of any proposed aggravating circumstance (other than the two established by the jury's verdicts) or of any offered mitigating circumstance. The trial court's jury charge in this case failed to adequately inform the jury what it had to find to recommend the death penalty and, as such, provided little restraint on, or guidance for, the jury's discretion, particularly when the instructions did not even confine the jury to the evidence. Disregard for instructional requirements maximizes the risk of "[t]he standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury," Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). "[T]he States `must channel the [capital] sentencer's discretion by "clear and objective standards" that provide "specific and detailed guidance" and that "make rationally reviewable the process for imposing a sentence of death."' Godfrey v. Georgia, 446 U.S. 420, 428, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (plurality opinion) (footnotes omitted)." Franklin v. Lynaugh, 487 U.S. 164, 181, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988). Our state's "clear and objective standards" were not followed here. Any finding by the jury, other than the two aggravating circumstances recognized as a matter of law, was tainted because it was unreliable.
Because of the "independent state law grounds" and "statutory construction" noted above and in the following, we must remand for a sentencing hearing before a properly instructed jury.
"The legislatively mandated role of the jury in returning an advisory verdict, based upon its consideration of aggravating and mitigating circumstances, can not be abrogated by the trial court's errorless exercise of its equally mandated *76 role as the ultimate sentencing authority. Each part of the sentencing process is equally mandated by the statute (§§ 13A-5-46, -47(e)); and the errorless application by the court of its part does not cure the erroneous application by the jury of its part. For a case consistent with our holding, see Johnson v. State, 502 So.2d 877 (Ala.Cr. App.1987). To hold otherwise is to hold that the sentencing role of the jury, as required by statute, counts for nothing so long as the court's exercise of its role is without error."
Ex parte Williams, 556 So.2d at 745 (emphasis added). Our relying on the two aggravating circumstances established as a matter of law to uphold Thomas's death sentence would totally ignore the jury's critical acts of considering any mitigating evidence and weighing its findings. Cf. Stewart v. State, 730 So.2d at 1211 (although the jury's guilt-phase verdicts established two aggravating circumstances as a matter of law, the trial court's failure to give an instruction concerning the process of weighing the aggravating and mitigating circumstances against each other was reversible error; "[t]he instruction given by the trial court in this case omitted the most fundamental consideration at the penalty phase and gave the jury no guidance").
The foregoing opinion was prepared by Retired Appellate Judge John Patterson while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e).
REMANDED FOR RESENTENCING.
LONG, P.J., and McMILLAN, BASCHAB, and FRY, JJ., concur; COBB, J., recuses herself.

On Return to Second Remand
PATTERSON, Retired Appellate Judge.
On November 20, 1996, the appellant, Billy Jack Thomas, was convicted of the capital offenses of murder committed during a rape in the first degree, § 13A-5-40(a)(3), Ala.Code 1975, and murder committed during a burglary in the first degree, § 13A-5-40(a)(3). On February 7, 1997, the trial court sentenced him to death. On December 30, 1999, this court affirmed his conviction, but remanded the case, pursuant to the requests of the appellant's counsel and the attorney general, to the trial court with instructions that it enter a proper sentencing order meeting the requirements of § 13A-5-47. Thomas v. State, 824 So.2d 1 (Ala.Crim.App.1999). We pretermitted discussion of any sentencing issues at that time. On return to remand, the trial court filed with this court a revised sentencing order. After reviewing the appellant's contentions regarding his sentencing, we concluded that the trial court's jury instructions in the sentencing phase failed to adequately guide and inform the jury of its proper role under the law. We found that the trial court failed to instruct the jury of the findings it was required to make to support a recommendation of the death penalty. Due to these deficiencies, we again remanded the case to the trial court, with instructions that it conduct a new sentencing hearing before a properly instructed jury. Thomas v. State, 824 So.2d 1, 67 (Ala.Crim.App.2000).
In a hearing on August 20, 2000, and by written motion, both parties jointly moved the trial court to allow them to waive the right to a sentencing hearing before a jury, as provided in §§ 13A-5-44(c) and -46(a). The written motion, which is in the record, was signed by the appellant, his counsel, and the prosecutor. In the motion, the prosecutor advised the court that he intended to recommend a sentence of life imprisonment without the possibility of parole, and the appellant advised the court that he was asking the court to accept the prosecutor's recommendation.
*77 In a lengthy colloquy with the appellant and his counsel, the trial court questioned them in reference to the appellant's understanding of the effects of waiving a jury's participation in the resentencing proceedings and of requesting a sentence of life imprisonment without the possibility of parole. Thereafter, the trial court consented to the waiver, accepted the State's recommendation, and resentenced the appellant to life imprisonment without the possibility of parole. It then advised the appellant of his right to appeal and appointed new counsel to represent him on appeal.
After reviewing the record, we conclude that the trial court complied with the requirements of § 13A-5-44(c) in reference to the appellant's waiver of jury participation in his resentencing. It affirmatively appears in the record, when that record is considered in its entirety, that the appellant himself waived his right to jury participation in the resentencing proceedings after he was expressly informed of such right. We find the resentencing proceedings to be in order. Based on the evidence presented during the guilt phase and the sentencing phase, we find the sentence to be appropriate. Accordingly, we affirm the trial court's judgment resentencing the appellant to life imprisonment without the possibility of parole.
The foregoing opinion was prepared by Retired Appellate Judge John Patterson while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e).
AFFIRMED.
McMILLAN, P.J., and BASCHAB, SHAW, and WISE, JJ., concur; COBB, J., recuses herself.

On Application for Rehearing
PATTERSON, Retired Appellate Judge.
In his application for rehearing, Thomas urges this court to review our rulings in the first 10 parts of our opinion on original submission. Thomas v. State, 824 So.2d 1 (Ala.Crim.App.1999). However, those issues were subject only to a "plain-error" review under Rule 45A, Ala. R.App. P. Because Thomas has been resentenced to life imprisonment without the possibility of parole, see Thomas v. State, 824 So.2d 1, 76 (Ala.Crim.App.2001) (opinion on return to second remand), this case is no longer governed by the "plain-error" doctrine. See Murry v. State, 562 So.2d 1348, 1363 (Ala.Crim.App.1988). We cannot review the 10 issues raised because they were not preserved in the circuit court.
The foregoing opinion was prepared by Retired Appellate Judge John Patterson while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Ala.Code 1975.
APPLICATION OVERRULED.
McMILLAN, P.J., and BASCHAB, SHAW, and WISE, JJ., concur.
COBB, J., recuses herself.
NOTES
[1] Law testified that, at the time of his testimony, he was incarcerated for a violation of his probation on a 1994 conviction for carrying a concealed weapon.
[2] We are aware that Lott's testimony regarding specific times does not correspond with Law's. However, the discrepancy is not significant to the issues presented.
[3] "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."

Rule 45A, Ala.R.App.P.
[4] Rule 52(b), Fed.R.Crim.P., which governs on appeal from criminal proceedings, provides: "PLAIN ERROR. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

We note the difference in wording: the federal rule provides that the plain error or defect may be noticed while the Alabama rule provides that we shall notice any plain error or defect. Compare Ala.R.App.P. 39(k), which states,
"In all cases in which the death penalty has been imposed, upon review of the opinion of the Court of Criminal Appeals on certiorari, the Supreme Court may notice any plain error or defect in the proceeding under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of the petitioner."
(Emphasis added.) However, we fail to see, when considering the pertinent caselaw, that this difference in wording creates a distinction in the application of these rules. Both rules allow each respective court the same discretion. Although the Court in Olano observed that Rule 52(b) is permissive and that the appellate court is not required to order correction even upon a finding that the forfeited error is plain and affects substantial rights (i.e., a finding of the first three Olano requirements), 507 U.S. at 735, 113 S.Ct. 1770, the Court continued:
"[T]he standard that should guide the exercise of remedial discretion under Rule 52(b) was articulated in United States v. Atkinson, 297 U.S. 157, 56 S.Ct. 391, 80 L.Ed. 555 (1936). The court of appeals should correct a plain forfeited error affecting substantial rights if the error `seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' Id., at 160[, 56 S.Ct. 391]."
507 U.S. at 736, 113 S.Ct. 1770 (emphasis added). Thus, as construed, the federal rule gives no more discretion than does Alabama's counterpart, which gives this court discretion as to the "appropriate appellate action" to be taken upon a finding of plain error.
[5] Although both appellate opinions state that Johnson's prints were taken on October 24, 1973, they do not specifically state the time between the date Johnson's fingerprints were taken and the date of the commission of the crime for which he was being tried. However, the trial court's sentencing order, quoted in the Court of Criminal Appeals' opinion, states that Johnson was 16 years old in 1974, 507 So.2d at 1348, and 20 years old at the commission of the crime for which he was being tried, id. at 1350. Therefore, we surmise that the taking of Johnson's prints occurred approximately five years before his commission of the capital crime.
[6] "Chapman reflected the concern ... that when courts fashion rules whose violations mandate automatic reversals, they `retrea[t] from their responsibility, becoming instead "impregnable citadels of technicality."' R. Traynor, The Riddle of Harmless Error 14 (1970) (quoting Kavanagh, Improvement of Administration of Criminal Justice by Exercise of Judicial Power, 11 A.B.A.J. 217, 222 (1925)).

"Since Chapman, the Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations.... The goal ... is `to conserve judicial resources by enabling appellate courts to cleanse the judicial process of prejudicial error without becoming mired in harmless error.' Traynor, supra, at 81."
United States v. Hasting, 461 U.S. 499, 509, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983).
[7] We note with approval the following caution:

"The question of what set of facts will fit into the `close juxtaposition' rule and what set of facts will not fit is not easy. Unquestionably, it would be better practice to charge on circumstantial evidence in all such cases. In determining whether this rule will apply, it is necessary to scrutinize the facts very closely."
Riggins, 468 S.W.2d at 845-46 (Roberts, J., dissenting).
[8] See, e.g., Fox v. State, 469 So.2d 800, 803 (Fla.App. 1 Dist.), cert. denied, 480 So.2d 1296 (Fla.1985) (in response to the state's urging that the court "abandon the rule requiring that circumstantial evidence must exclude every reasonable hypothesis of innocence and apply, instead, the more liberal standard allowing the jury to choose among several reasonable constructions of the evidence so long as the evidence establishes guilt beyond a reasonable doubt," the court stated that it "decline[s] to accept this concept and fashion a new rule in Florida which would be patently inconsistent with a long line of Florida decisions imposing the stricter, but time-tested, standard").
[9] In its jury charge at the close of the guilt phase, the trial court gave the following instruction in regard to the degree of proof necessary to sustain verdicts of guilty:

"Ladies and gentlemen, again, I tell you that this Defendant entered this courtroom presumed to be innocent of the offenses charged against him; that [is], two counts of a capital offense and any lesser included offenses.... He is presumed to be innocent of those offenses, and this presumption of innocence attends him as a matter of evidence throughout the trial unless and until the State of Alabama proves his guilt beyond a reasonable doubt.... If they fail to meet that burden, then your verdict as a jury must be one of not guilty, an acquittal. There is no duty or responsibility on a defendant in a criminal proceeding to present any evidence or give any testimony.
"A reasonable doubt means simply what it says. It's a doubt for which a reason can be given. It is not merely a guess or a surmise. A reasonable doubt may arise from all of the evidence or from a lack of evidence or from any part of the evidence.
"The State is not required to prove the guilt of the defendant beyond all doubt, but beyond all reasonable doubt. If after comparing and considering all of the evidence in the case you can say that you have an abiding conviction to a moral certainty of the truth of the charge, then you are convinced beyond a reasonable doubt and your duty is to convict the Defendant, to find him guilty. If you cannot say that, your duty is to acquit him, to find him not guilty."
(R. 414-15.)
[10] State's Exhibit 27 is a dried bloodstain of the blood sample in a vial; the sample is marked as being that of Thomas. As explained during the direct examination of William Jones, a forensic biologist with the Department of Forensic Sciences:

"A.... State's Exhibit 27 is a known blood sample identified to me when I received it from Officer Stallworth as a known blood sample from Billy Jack Thomas.
"Q.... [T]ell us when you say `a known blood sample,' take it out [of the evidence package], and show us what you're talking about.
". . . .
"A. This is a dried bloodstain of the blood that was in the vial of blood given to me from Officer Stallworth. When blood is received to us, in order to make it in a more stable and a testable condition and less disease, it doesn't.... It doesn't ... transmit diseases as readily in a dried state as it does in a liquid state, which is why we make a dried blood stain from all individuals that have their blood turned into us."
(R. 292-93.)
[11] At the end of the prosecution's questioning of Brewer outside of the jury's presence before Brewer testified before the jury, the prosecutor stated, "Your Honor, at this time, that's all the questions as to the prongs of the Perry test." (R. 330.)
[12] In Ex parte Holton, 590 So.2d 918, 919-20 (Ala.1991), the Alabama Supreme Court stated:

"This opinion sets forth an analysis to be followed in deciding whether a proper chain of custody has been shown. We have held that the State must establish a chain of custody without breaks in order to lay a sufficient predicate for admission of evidence. Ex parte Williams, 548 So.2d 518, 520 (Ala.1989). Proof of this unbroken chain of custody is required in order to establish sufficient identification of the item and continuity of possession, so as to assure the authenticity of the item. Id. In order to establish a proper chain, the State must show to a `reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.' McCray v. State, 548 So.2d 573, 576 (Ala.Crim.App. 1988). Because the proponent of the item of demonstrative evidence has the burden of showing this reasonable probability, we require that the proof be shown on the record with regard to the various elements discussed below.
"The chain of custody is composed of `links.' A `link' is someone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link's possession of the item. `(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.' Imwinkelried, The Identification of Original, Real Evidence, 61 Mil.L.Rev. 145, 159 (1973).
"If the State, or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a `missing' link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the `link,' as to one or more criteria or as to one or more links, the result is a `weak' link. When the link is `weak,' a question of credibility and weight is presented, not one of admissibility."
See also Ex parte Scott, 728 So.2d 172, 182 (Ala.1998), cert. denied, 528 U.S. 831, 120 S.Ct. 87, 145 L.Ed.2d 74 (1999); Ex parte Slaton, 680 So.2d 909, 918 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997). Moreover, as the Alabama Supreme Court noted in Kennedy v. State, 690 So.2d 1222, 1224 (Ala.1996), "Certain provisions of the new Alabama Rules of Evidence deal with the necessity for laying a foundation for the admission of demonstrative evidence.... [W]e note that the commentary to Rule 901[, Ala.R.Evid.,] states the same principles of law that are set out in the Holton opinion." (Footnote omitted.) Rule 901(a), Ala.R.Evid., provides, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."
[13] For information about the National Research Council, see n. 19, infra.
[14] Barnes v. State, 704 So.2d 487 (Ala.Cr.App. 1997), presented an issue we review here under plain error: whether Thomas was denied his right to confrontation by the absence of a "link" in the chain for cross-examination. In Barnes, a death-penalty case, the prosecution's critical evidence consisted of Barnes's admissions to the police that he had burglarized the victim's house, the matching of Barnes's fingerprints with some found at the scene, and the matching of DNA from semen on a vaginal swab of the victim with Barnes's DNA, strongly suggesting that Barnes had had sexual intercourse with the victim. Id. at 490. The forensic scientist who had supposedly gathered the specimen from the victim's body did not testify. Instead, to establish the chain of custody for this evidence, the prosecution relied on a receipt customarily prepared by pathologists who perform autopsies for the Department of Forensic Sciences. Id. at 493. Judge Sue Bell Cobb, with whom all the judges concurred, in declining to discuss a chain-of-custody problem, acknowledged that Barnes's right to confrontation was denied. The court rejected the application of harmless error and reversed for the trial court's order admitting the samples without allowing Barnes the opportunity to cross-examine the pathologist. We find two critical distinctions between Barnes and the instant case. First, the issue in Barnes was preserved. Here, defense counsel obviously saw no need to question anyone further about the chains of the DNA-profiling evidence, and we are thus reviewing for plain error. Second, the evidence in Barnes clearly established that a critical link in the chainthe one who gathered the evidence "devastating" to the defense and "crucial" to the prosecution's casewas not present to testify while, here, any "missing" link is sheer speculation. Put another way, we have nothing in the record to suggest that Thomas was denied his right to confrontation in regard to the DNA samples.
[15] "DNA matching evidence shows that one sample of DNA `matches,' or resembles, another sample of DNA within a permissible range of error. DNA population frequency statistical evidence concerns the frequency with which a given DNA pattern might occur in a given population."

Turner v. State, 746 So.2d 355, 357 (Ala.1998).
[16] Frye v. United States, 54 App. D.C. 46, 293 F. 1013 (D.C.Cir.1923).
[17] Thomas was tried in November 1996. Section 36-18-30 (codified from Act No. 94-804, p. 109 § 11, Ala.Acts 1994) became effective May 6, 1994.
[18] Thomas was afforded a full opportunity, in the suppression hearing and before the jury, to contest the prosecution's evidence of the match of the DNA profiles of the vaginal swabs and Thomas's blood sample and of its statistical significance.
[19] "The National Research Council (the `NRC') has generated several primary sources cited almost universally in judicial decisions assessing DNA forensic analysis and the associated statistics. The NRC is a private, non-profit society of distinguished scholars that is administered by the National Academy of Sciences, the National Academy of Engineering and the Institute of Medicine. The NRC formed the Committee on DNA Technology in Forensic Science to study the use of DNA analysis for forensic purposes, resulting in the issuance of a report in 1992. See Committee on DNA Technology In Forensic Science, National Research Council, DNA Technology in Forensic Science (1992); see generally State v. Marcus, 294 N.J.Super. 267, 683 A.2d 221, 227 n. 6 (1996). A new committee was subsequently formed to study recent developments in the field, which also issued a frequently cited report. See National Research Council, The Evaluation of Forensic DNA Evidence 63 (1996); see generally Marcus, 683 A.2d at 227 n. 6; R. Stephen Kramer, Comment, Admissibility of DNA Statistical Data: A Proliferation of Misconceptions, 30 Cal.W.L.Rev. 145, 147 & n. 17 (Fall, 1993) (noting that courts have traditionally deferred to pronouncements from the National Academy of Sciences) (citing Rorie Sherman, DNA Unraveling, Nat'l L.J. 1, 30 (Feb. 1, 1993))."

Commonwealth v. Blasioli, 552 Pa. 149, 713 A.2d 1117, 1119-20 n. 3 (Pa.1998).
Brewer, when asked by the prosecutor to explain what the National Research Council is, testified:
"The National Research Council was a committee that was organized from the National Academy of Sciences to study forensic DNA profiling and DNA profiling in general ..., and to make recommendations about the types of quality control measures that will be performed and to report on the general reliability and scientific acceptance of the technology."
(R. 329-30.)
[20] See, for example, the following cases finding the product rule evidence admissible under the Daubert test: United States v. Chischilly, 30 F.3d 1144, 1153 (9th Cir.1994), cert. denied, 513 U.S. 1132, 115 S.Ct. 946, 130 L.Ed.2d 890 (1995); State v. Loftus, 573 N.W.2d 167 (S.D.1997).

See, for example, the following cases relying, in part, on the 1996 NRC Report in upholding use of the product rule: State v. Marshall, 193 Ariz. 547, 975 P.2d 137, 141 (Ariz.App.1998) (quoting State v. Johnson, 186 Ariz. 329, 922 P.2d 294, 299 (Ariz.1996)) ("Endorsement by the NRC `is strong evidence of general acceptance within the relevant scientific community.'"); Clark v. State, 679 So.2d 321, 321 (Fla.App.1996) ("product rule calculations are appropriate as a matter of scientific fact and law"); State v. Kinder, 942 S.W.2d 313, 327 (Mo.1996), cert. denied, 522 U.S. 854, 118 S.Ct. 149, 139 L.Ed.2d 95 (1997); State v. Freeman, 253 Neb. 385, 571 N.W.2d 276, 293 (Neb.1997); State v. Copeland, 130 Wash.2d 244, 922 P.2d 1304, 1319-20 and n. 6 (Wash.1996).
[21] Thomas objected to the admission of Exhibit 23, but on a different ground: "No proper predicate. [Nurse Howell] can't identify who he took the sample from." (R. 288.)
[22] The trial court instructed:

"I charge you a male commits the crime of rape in the first degree if he engages in sexual intercourse with a female by forcible compulsion."
"A person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein, and if in effecting entry or while in the dwelling or in immediate flight therefrom, he or another participant in the crime causes physical injury to any person who is not a participant in the crime."
(R. 417, 418) (emphasis added).
[23] As we did in regard to the alleged missing "links" of the chains of custody for the DNA evidence in Part IV of this opinion, at n. 14, we have reviewed the lack of an authenticating witness for Thomas's fingerprint card for plain error in regard to Thomas's right to confrontation. The usefulness of confronting the missing witness would have been remote and, as we discussed supra, the card bore adequate "indicia of reliability." See 704 So.2d at 494-95. Thus, we find no plain error.
[1] In enumerating the aggravating circumstances "proven beyond a reasonable doubt," the trial court fashioned its findings in regard to "the capital offense." However, as the jury's verdicts indicate, there were actually two capital offenses.
[2] This general statement is obviously qualified by the following:

"While most pattern jury instructions may be properly used in the majority of criminal and civil cases, there may be some instances when using those pattern charges would be misleading or erroneous. In those situations, trial courts should deviate from the pattern instructions and give a jury charge that correctly reflects the law to be applied to the circumstances of the case. Similarly, while there will likely be few instances in which the giving of a pattern instruction would be plainly erroneous in a capital case, we do not foreclose that possibility. For that reason, a trial court must diligently scrutinize the jury charges it giveseven pattern chargeson a case-by-case basis to ensure that they properly instruct the jury in accordance with applicable statutes and caselaw."
Ex parte Wood, 715 So.2d 819, 824 (Ala.1998).
[3] In these preliminary instructions, the court prefaced its reading of all eight aggravating circumstances with the mandate: "Aggravating circumstances shall be the following...." (R. 450-51; emphasis added.) Compare the Pattern Jury Instructions, pp. 82, 83, which introduce any properly proposed aggravating circumstance with: "The law of this state provides a list of aggravating circumstances which may be considered by the jury" and "Of the list of aggravating circumstances provided by law, there are [Insert number of aggravating circumstances to be charged on] circumstances which you may consider in this case." (Emphasis added.) In its closing oral charge, the court repeated that it was instructing the jury "as to what [it] should consider during the penalty phase" (R. 479) and again prefaced its reading of all eight aggravating circumstances with the mandate: "Aggravating circumstances shall be the following...." (R. 480). Moreover, the trial court did not give the following instruction recommended by the Pattern Jury Instructions, pp. 83-84:

"The fact that I instruct you on such aggravating circumstance(s) or define it (them) for you does not mean that the circumstances(s) or any other aggravating circumstance(s) has (have) been proven beyond a reasonable doubt in this matter. Whether any aggravating circumstances(s) which I instruct you on or define for you has (have) been proven beyond a reasonable doubt based on the evidence in this matter is for you, the jury, alone to determine. The aggravating circumstance(s) which you may consider in this case if you find from the evidence that they may have been proven beyond a reasonable doubt (are)(is) as follows:
". . . ."
(Emphasis added.)
[4] The aggravating circumstance of § 13A-5-49(4) ("[t]he capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary or kidnapping") may apply more than once if the accused murders another while committing any variation of the four enumerated felonies. See Stewart v. State, 730 So.2d 1203, 1212 (Ala.Cr.App.1996), aff'd, 730 So.2d 1246 (Ala.1999).
[5] But see Griffin v. State, 790 So.2d 267, 338 (Ala.Cr.App.1999), wherein the court noted that "we do not wish to be seen as approving the practice of during the penalty phase merely referencing previous instructions given during the guilt phase of a capital murder trial."
[6] The trial court's jury charge contained other deficiencies, some of which are noted below:

1. The jury was not instructed that its findings regarding any aggravating or mitigating circumstance were restricted to the evidence.
2. The jury was not charged as to what aggravating and mitigating circumstances are and what their function is in the jury's sentencing deliberations.
3. The jury was not charged on the definition of "under sentence of imprisonment," which in this case was a significant omission because the attorneys referred only to Thomas's two prior convictions, i.e., they did not explain that "under sentence of imprisonment" includes serving a term of imprisonment while under a suspended sentence or while on probation, which was Thomas's status at the time of the commission of the capital offenses. See definitional instruction in the Pattern Jury Instructions, p. 85.
4. The jury was not instructed, as required by Beck v. State, 396 So.2d 645, 663 (Ala. 1980), "to avoid any influence of passion, prejudice or other arbitrary factor while deliberating and fixing the sentence." See also Jefferson v. State, 473 So.2d 1100, 1103 (Ala.Cr.App.1984), aff'd, 473 So.2d 1110, 1111, n. 2 & n. 3 (Ala.1985) (failure to so charge, along with another instructional error, required a remand for a new sentencing hearing). See also Pattern Jury Instructions, p. 90.
The trial court also did not take heed of the following cautionary note in the Proposed Pattern Jury Instructions, n. 1, p. 83 (note omitted):
"The jury should not be instructed on any aggravating circumstance listed in § 135-49 which is irrelevant to the case, or for which there is insufficient evidence to support a factfinding, or which cannot be found as a matter of law in the particular type of capital offense for which the defendant has been convicted."